**Mark A. HOPKINSON,
Petitioner–Appellant,**

v.

**Duane SHILLINGER, and the Attorney General of the State of Wyoming,
Respondents–Appellees.**

No. 86–2571.

United States Court of Appeals,
Tenth Circuit.

Jan. 23, 1989.

Daniel J. Sears, Denver, Colo. (Leonard D. Munker, Public Defender, and Martin J. McClain, Asst. Public Defender, State of Wyo., Cheyenne, Wyo., with him, on the briefs), for petitioner-appellant.

Terry L. Armitage, Asst. Atty. Gen. (Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., with him, on the brief), State of Wyo., Cheyenne, Wyo., for respondents-appellees.

Before LOGAN and ANDERSON, Circuit Judges, and CONWAY, District Judge.*

LOGAN, Circuit Judge, delivering the opinion of the Court as to Parts I through VII.

I

Mark A. Hopkinson appeals from the summary dismissal of his petition for a writ of habeas corpus in which he chal-

---

* The Honorable John E. Conway, United States District Judge for the District of New Mexico, sitting by designation.

lenged his convictions for first-degree murder and his sentence of death, *Hopkinson v. Shillinger*, 645 F.Supp. 374 (D.Wyo. 1986) (*Hopkinson VIII*), and the summary denial of his motion to compel disclosure of certain FBI files, filed pursuant to the Freedom of Information Act, 5 U.S.C. § 552. The district court denied Hopkinson's motions for reconsideration. *Hopkinson v. Shillinger*, 648 F.Supp. 141 (D.Wyo.1986).

The odyssey of this case began in Wyoming state court in 1979 where Hopkinson was tried and convicted on four counts of first-degree murder and two counts of conspiracy to commit first-degree murder. The first three counts of murder arose out of his hiring Michael Hickey to bomb Vincent Vehar's home. That bombing killed Vehar, Vehar's wife and one of his sons; another son was injured in the blast but survived. The fourth murder count was for procuring the killing of Jeff Green. Hopkinson was sentenced to life imprisonment for each of the Vehar murders, and to death for the murder of Green. *See Hopkinson v. State*, 632 P.2d 79, 97 (Wyo. 1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982) (*Hopkinson I*). Hopkinson was also convicted in the same trial of conspiracy with Harold James Taylor to commit the first-degree murder of Vehar and conspiracy with Hickey to commit the first-degree murder of William Roitz.

Hopkinson appealed to the Wyoming Supreme Court, which affirmed each of the convictions but vacated the death sentence and ordered a new sentencing trial for the

Green murder. *Id.* at 172. At the second sentencing trial, Hopkinson was again sentenced to death. He appealed to the Wyoming Supreme Court, which this time affirmed the sentence. *Hopkinson v. State*, 664 P.2d 43 (Wyo.), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983) (*Hopkinson II*). He also filed a number of post-trial motions in the Wyoming courts, all of which have been denied.[1]

Hopkinson presents the following arguments for invalidating his murder convictions: (1) the introduction of evidence of prior crimes, wrongs or bad acts denied him a fair trial; (2) the introduction of Green's and Vehar's out-of-court statements violated his constitutional rights to confrontation and cross-examination; (3) he was denied effective assistance of counsel; (4) prosecutorial misconduct in closing argument denied him a fair trial; (5) the trial atmosphere violated his due process rights; and (6) the prosecution's suppression of exculpatory evidence denied him due process.

Hopkinson argues that we should invalidate the death sentence imposed in the second sentencing proceeding on the following grounds: (1) the "especially heinous, atrocious or cruel" aggravating circumstance was applied unconstitutionally; (2) the prosecutor's argument violated the rule of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (3) the conduct of the penalty hearing permitted the jury to impose the death penalty in an arbitrary and capricious manner and violated his right to due process; (4) he was denied effective assistance of counsel;

1. The Wyoming Supreme Court affirmed the denial of Hopkinson's motion for a new trial in *Hopkinson v. State*, 679 P.2d 1008 (Wyo.), *cert. denied*, 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984) (*Hopkinson III*). The denial of his first petition in state court for post-conviction relief and writ of habeas corpus was affirmed by the Wyoming Supreme Court in *State ex rel. Hopkinson v. District Court, Teton County*, 696 P.2d 54 (Wyo.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985) (*Hopkinson IV*). That court also upheld the denial of his motions for reduction of sentence and stay of execution in *Hopkinson v. State*, 704 P.2d 1323 (Wyo.), *cert. denied*, 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985) (*Hopkinson V*). The denial

of his second petition filed in state court for writ of habeas corpus was affirmed by the Wyoming Supreme Court in *Hopkinson v. State*, 708 P.2d 46 (Wyo.1985) (*Hopkinson VI*). The denial of his request for discovery of grand jury testimony was affirmed in *Hopkinson v. State*, 709 P.2d 406 (Wyo.1985) (*Hopkinson VII*).

Hopkinson also filed a *Brady* request in federal court for access to the court file of Michael Hickey, which contained details of Hickey's plea bargain on federal charges stemming from the murders of the Vehars and the murder of Kelly Wyckhuyse. We affirmed the district court's denial of this request. *United States v. Hickey*, 767 F.2d 705 (10th Cir.), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 576, 88 L.Ed.2d 559 (1985).

(5) adverse publicity generated by the prosecutor shortly before the hearing denied him a fair trial; and (6) the prosecution's knowing use of false testimony violated due process.

Hopkinson also asserts that Wyoming's procedures for postconviction relief are invalid under the Fourteenth Amendment. Finally, he appeals the summary dismissal of his Freedom of Information Act request for certain FBI files.

## II

### The Facts

The following briefly summarizes the principal evidence produced by the prosecution at the guilt phase of Hopkinson's trial. Hopkinson did not testify at the trial, and, at his direction, the defense put on no evidence. VIII–M R. 1690–95.

### A. The Vehar Murders

In December 1975, Hopkinson requested the Fort Bridger, Wyoming, Sewer and Water Board to annex a trailer court owned by his family, then under construction, to the Fort Bridger Sewer District and to hook the entire trailer court onto the district's sewer lines for the usual $100 hookup fee. VIII–D R. 96. Vincent Vehar, the board's attorney, advised the board that $100 was inadequate payment for connecting the entire trailer court onto the sewer. Id. at 97, 100–01. Before the board took any official action on the request, a petition which Vehar drafted, id. at 234–35, and which ninety-five percent of the district's membership signed, was presented to the board, requesting it to increase Hopkinson's connection fee. Id. at 235, 257–58. After conducting several public hearings, the board entered into a contract with Hopkinson providing for the annexation of his property to the district and requiring the payment of

$300 for each trailer connected, for a total of $12,300. Id. at 106. Pursuant to the contract Hopkinson agreed to pay the connection fee in installments, id. at 115, and to pay a monthly service fee of $120, id. at 238.

Hopkinson connected the trailer court to the sewer but then refused to pay amounts owing under the contract. Id. at 199–200; VIII–E R. at 339–41. The board, represented by Vehar, decided to sue him. This lawsuit, filed on January 28, 1977, sought the $12,300 fee, plus additional monies for legal and engineering costs incurred in connecting the trailer park to the system. VIII–D R. at 115–17. The suit also sought $1,000 actual damages and $50,000 punitive damages for threats Hopkinson allegedly made against the board members to convince them to disavow the contract. Id. at 129.[2] Once the suit was filed, Vehar withdrew from the case because he anticipated being called as a witness. Id. at 105. His associate, John Troughton, replaced him. Id.

On August 1, 1977, the board met to discuss the lawsuit and to assist Troughton in preparing for Hopkinson's deposition. VIII–E R. 280–81. Hopkinson attended part of this meeting and repeatedly asked the board to fire Vehar and to submit the dispute to arbitration. Id. at 286–87, 301–02. The board decided, however, to maintain the lawsuit. On August 3, Troughton sent notice to Hopkinson's attorney that he would depose Hopkinson on August 9 in connection with the sewer board's lawsuit. VIII–D R. 118–21.

At approximately 3:35 a.m. on August 7, an explosion destroyed Vehar's home and killed Vehar, his wife, and his younger son. Another son, Tony, was injured in the blast but survived. An investigation by the federal Bureau of Alcohol, Tobacco and Fire-

---

**2.** Hopkinson previously had been involved in another dispute with clients of Vehar. In 1974, Arlene Sweat and her husband, represented by Vehar, filed suit against Hopkinson's parents over water rights. While this suit was pending, Hopkinson and his father assaulted Arlene Sweat's father, Frank Roitz. VIII–E R. 392, 395–96. Judgment was entered in favor of the Sweats in 1976. Hopkinson then assumed con-

trol of the litigation and sought to have the judgment overturned on appeal. Hopkinson I, 632 P.2d at 93 n. 6. Oral arguments for the appeal were scheduled for September 1977, VIII–D R. 171; the appeal was dismissed after Vincent Vehar's death. For a more detailed account of this dispute, see Hopkinson I, 632 P.2d at 93.

arms revealed that a dynamite bomb caused the explosion. VIII–H R. 1326. A few days later, Hopkinson told a sewer board member, "I'm glad the old son-of-a-bitch [Vehar] is dead. If somebody wouldn't have done it, I would have done it myself." VIII–E R. 367.

Nearly two years later, in 1979, Michael Hickey confessed to bombing the Vehars' home. Testifying at trial under a grant of immunity,[3] Hickey stated that Hopkinson first asked him in early 1977 whether he would kill Vehar for $2,000 plus expenses. VIII–G R. at 916. Hopkinson knew at that time that Hickey had killed a local fifteen-year-old girl, Kelly Wyckhuyse. *Id.* at 913–15. Over a period of several months, the two discussed various methods of accomplishing Vehar's murder. *Id.* at 917–29. As the deposition in the sewer board case neared, Hickey testified that Hopkinson became "desperate," *id.* at 930, and decided that a dynamite explosion of Vehar's house would be the best way to kill Vehar, *id.* at 930–33, 971–72. Hickey agreed to bomb the house for the offered sum plus Hopkinson's help should Hickey be charged for Wyckhuyse's murder. *Id.* at 932. Hopkinson told Hickey that he did not care if the bomb killed everyone in the house, *id.* at 932, 971, 987, or if it killed half of Evanston, Wyoming, VIII–H R. 1231, so long as it killed Vehar.

On August 6, Hickey saw Hopkinson outside a clothing store Hopkinson operated. Hopkinson told him repeatedly that he wanted Vehar killed that night. VIII–G R. at 969–70, 976. Hickey went to a local bar that evening and stayed there until approximately 1:30 a.m. After the bar closed, he spent approximately an hour with a woman who had been at the bar. *Id.* at 1007. He then went to his girlfriend's house, *id.* at 1029–30; finding that she was not home, he left for Evanston, where Vehar lived.

Upon arriving in Evanston, he cased the Vehar home. *Id.* at 1015–18. He then threw a bomb, which contained approxi-

mately thirty sticks of dynamite, *id.* at 1071, into the basement of the house, *id.* at 1022–23. After throwing the bomb, Hickey immediately headed back to the Bridger Valley. In Hickey's words, he bombed the Vehar home that night because "Mark Hopkinson was going to pay me and he just kept after and kept after me, finally I just did it to get him off my back." *Id.* at 1034.

Hopkinson told Hickey that they should not be seen together after the bombing, so Hickey rarely went to see Hopkinson. VIII–H R. 1132–33; VIII–J R. 1023. Hickey did show up occasionally to collect for the killing, however. According to Hickey, Hopkinson gave him a gift certificate of $200, to give to his girlfriend, Jennifer Larchick. VIII–G R. 1036–37. Hopkinson later paid him approximately $500 in two payments, *id.* at 1038, 1045, and gave him clothes from his store, *id.* at 1039. Hopkinson also helped orchestrate a plan to cover up Hickey's involvement in the Wyckhuyse murder, which involvement Hopkinson had discovered before commissioning the bombing. According to this plan, Hopkinson, Hickey, and Jeff Green would all testify that another person had killed Wyckhuyse. *See infra.* Hopkinson also asked a woman to tell authorities that Hickey was with her when Wyckhuyse was killed. VIII–G R. 1100–02.

Other evidence corroborates Hickey's confession. He was seen with thirty or more sticks of dynamite in the back of his truck a week before the bombing. VIII–H R. 1310. The morning of the bombing, a deputy sheriff saw him traveling on the interstate west toward Evanston. VIII–H R. 1276–78, 1281. Jeffrey Kofroth testified that he was hitchhiking that morning and that Hickey, who was traveling east toward the Bridger Valley, picked him up just outside Evanston between 3:30 and 4:00 a.m. VIII–I R. 796–99.

The record also corroborates, both directly and indirectly, Hickey's implication of

---

**3.** Hickey testified under a grant of full immunity for the Vehar murders. VIII–G R. 857. In exchange for his testimony, Hickey was also assured that if he decided to plead guilty to murdering Kelly Wyckhuyse, the court would accept a plea to second degree murder and sentence him to twenty to twenty-one years in prison. *Id.* at 858. Hickey subsequently did plead guilty to murdering Wyckhuyse. *Id.* at 873, 883–84.

Hopkinson in the Vehar murders. Larchick testified that Hickey gave her a gift certificate of $200 in August 1977 to use toward her rent. VIII–K R. 1278. In October 1977, Hopkinson borrowed the car of an employee, Judy Jensen, to meet Hickey, as he did not want anyone to notice him talking with Hickey. VIII–J R. 1023. Several witnesses testified that Hopkinson did in fact help devise and participate in a plan to testify falsely in order to clear Hickey of the Wyckhuyse murder charges. In addition, Hopkinson did not conceal his dislike for Vehar, and he previously had hired another person, Harold James Taylor, to kill him, but Taylor backed out.[4] In 1978, after Jeff Green had testified contrary to Hopkinson's direction, including, *inter alia*, that Green believed Hopkinson had been responsible for Vehar's death, Hopkinson told Green's sister, Judy Jensen, "[E]verything Jeff said is the truth but they'll never get me because I'll lie about it to the end...." VIII–J R. 1015.

### B. The Green Murder

In 1977 Hopkinson hired Jeff Green, who previously had worked for Hopkinson as a carpenter, to plant a bomb on the car of George Mariscal, an attorney who lived in Phoenix, Arizona and who allegedly owed Hopkinson money. Green left for Arizona in Hopkinson's car with a two-stick dynamite bomb. VIII–H R. 1355. However, Green was stopped on April 4, 1977, for speeding in Coalville, Utah, and the bomb was discovered. *Id.* Green was arrested and jailed; Hopkinson and Hickey bailed him out of jail. VIII–G R. 908–10.

That fall, police questioned Jamey Hysell about several larcenies. As bargaining leverage, he told them about Kelly Wyckhuyse's murder. Hickey, who killed Wyckhuyse, had shown Hysell where he had buried her body, so Hysell was able to lead police to the body. As a result of Hysell's information, Hickey was charged with this murder in October 1977. In order to save Hickey, Hopkinson devised a plan whereby Green, Hickey and Hopkinson would all implicate Hysell in the murder. VIII–G R.

1092–1100. Green told the county prosecutor and the grand jury investigating the murder that he saw Hysell covered with blood after the murder and later saw a homemade coffin in Hysell's residence which had blood leaking from it. As a result of Green's statements, the murder charge against Hickey was dropped, and Hysell was charged with Wyckhuse's murder in March 1978.

Green recanted, however, at Hysell's murder trial in July 1978. VIII–I R. 936, 943–44. Green testified that Hopkinson had directed him to implicate Hysell but that Hickey had actually killed Wyckhuyse. *Id.* at 939–43. While on the stand, Green revealed his knowledge about other matters, as well. He testified that Hopkinson had hired him to bomb Mariscal's car, *id.* at 945–46; he also testified that when he heard about the Vehar murders, "I had thought that Mark [Hopkinson] had the job done and I believed that he was responsible for it, but I never did know for sure." *Id.* at 948. Hysell was acquitted of the murder charge.

Green's sister, Judy Jensen, was employed by Hopkinson at his clothing store at this time. VIII–J R. 998. Shortly after the Hysell trial, Jensen discussed with Hopkinson whether he wanted her to continue working for him. *Id.* at 1013. According to Jensen's testimony, the following exchange occurred:

"[Hopkinson] asked me how I felt about it and I told him I felt everything Jeff said was the truth, and then he got really hysterical and told me he didn't know why I believed Jeff and not him, and I told him, I said, Mark, if you're innocent you have nothing to worry about and he says, well, everything Jeff said is the truth but they'll never get me because I'll lie about it to the end and besides Jeff will never live to testify against him because I'll have him killed. The only way out for him is death because nobody does that to Mark Hopkinson."

*Id.* at 1015. Hopkinson repeated these threats on Green's life each time he spoke

---

4. Hopkinson was convicted of conspiracy to commit murder for hiring Taylor to kill Vehar.

with her over the next few days. *Id.* at 1017–19.

Hopkinson was indicted in August 1978 on conspiracy charges arising out of the aborted plan to bomb Mariscal's car. In March 1979 he and Hickey were tried on federal charges stemming from this incident; Green testified for the prosecution at this trial, in which Hopkinson was convicted and Hickey was acquitted. *See United States v. Hopkinson,* 631 F.2d 665, 666–69 (10th Cir.1980), *cert. denied,* 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 620 (1981). After Green testified, Hopkinson told his friend Jennifer Larchick that he would get Green. VIII–K R. 1219. Hopkinson was sentenced to ten years, which he commenced serving in the federal prison at Lompoc, California.

At Lompoc Hopkinson had unlimited access to a telephone, VIII–J R. 1150–51, and he made numerous calls to friends. *See Hopkinson I,* 632 P.2d at 96 n. 9 (record of 114 calls Hopkinson made in April and May 1979). He called Hap Russell, a former roommate from Salt Lake City, who came to Lompoc to visit him. VIII–K R. 1346–48, 1356–57. He repeatedly called Larchick, who lived near Green, and asked about Green and the impending grand jury investigation of the Vehar bombing. *Id.* at 1225–27. Hopkinson several times sought a photograph of Green from Randy Reinholtz. He also asked Larchick to send a photo of Green to Russell. *Id.* at 1228. Larchick eventually agreed to do this; she sent a photo cut from a high school yearbook to Russell on April 24, *id.* at 1235, 1237, and also showed Russell where Green lived. VIII–L R. 1454. She also told Hopkinson that Green reputedly was talking with the prosecutors about the Vehar bombing. VIII–K R. at 1229–30. On May 2, Hopkinson began calling a former girlfriend, Kristi King, who lived in California. VIII–L R. 1618. During a phone conversation on May 19, she agreed that he could deposit some money in her bank account which she would keep for him. *Id.* at 1623–24.

On May 16 Hopkinson called Larchick and asked if she had seen Green. Larchick

testified that Hopkinson "couldn't understand what [Green] was going to testify to because he heard that he had his mouth wired shut because he was having a bunch of dental work done...." VIII–K R. 1240. He asked Larchick to watch for cars with Utah license plates in Green's neighborhood and to write down their license numbers. *Id.* at 1240–41. He asked her about the grand jury; she told him she had been subpoenaed and that it would soon begin its investigations. *Id.* at 1241–42. He called her on May 17 and again asked if she had seen Green. *Id.* at 1242–43. Meanwhile, Green had been away at a funeral. VIII–J R. 1052–53.

After Green returned on the evening of May 17, two men went to the Green home and spoke to his mother. *Id.* at 1053. Green was not home at the time, and the two men left. They returned the next morning, and Green left with them. *Id.* at 1057–60. This was the last time Green was seen alive.

Hopkinson called Larchick again on May 19 to inquire about Green; she told him Green was missing. VIII–K R. 1243–44. On May 20, the day before the grand jury investigating the Vehar murders was set to convene, Green's body was found near a rest stop off Interstate 80, near Fort Bridger, Wyoming. VIII–J R. 1112–15, 1123–24. Green had received over 140 burns, *id.* at 1162–68, 1185, before he was killed by a gunshot wound, *id.* at 1181–82. When Hopkinson called Larchick that day, she advised him that Green was dead. VIII–K R. 1245.

At Hopkinson's direction, his mother transferred $15,000 into King's bank account on May 21. VIII–L R. 1628–30. The next day King received a telephone call from a man who identified himself as "Joe" and who asked if she had received $20,000 in her account for him. *Id.* at 1633–34. "Joe" demanded that she meet him at the San Francisco airport to give him the money. *Id.* King refused, *id.* at 1635, and "Joe" called her again that night, *id.* at 1643. When Hopkinson called King on May 25, she asked him about Joe. Hopkinson requested that she take the money to

the airport. *Id.* at 1647–48. When she continued to refuse, Hopkinson asked that she send the money back to his brother, Scott. *Id.*

## III

### *Hopkinson's Challenge to the Murder Convictions*

Preliminarily, we reject Hopkinson's claim, raised as issue VI in his appellate brief, that the federal district court improperly applied a presumption of correctness under 28 U.S.C. § 2254(d) to state law determinations on questions of law or mixed questions of law and fact. Hopkinson has not identified, and we have not found, any legal issues to which the district court applied such a presumption. In any event, on appeal we review de novo all questions of law and mixed questions of law and fact.

### A. Evidence of Other Crimes, Wrongs, or Acts

■■■ Hopkinson asserts that evidence of prior crimes, wrongs or acts was improperly admitted under Wyo.R.Evid. 404(b),[5] and that the admission of this evidence denied him a fair trial.[6] We note that

despite defense counsel's occasional failure at trial to interpose timely objections, all of the evidentiary issues Hopkinson raises are properly before us since the Wyoming Supreme Court considered the merits of these issues on direct appeal in order to determine whether plain error had occurred. *Hopkinson I,* 632 P.2d at 124–27.[7] In order for a federal court to grant habeas relief based on state court evidentiary rulings, the rulings must "render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Brinlee v. Crisp,* 608 F.2d 839, 850 (10th Cir.1979), *cert. denied,* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980). Thus, we will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law. *Woodruff v. Lane,* 818 F.2d 1369, 1373 (7th Cir.1987); *see also Wood v. Lockhart,* 809 F.2d 457, 460 (8th Cir.1987).

■■■ After considering all of the evidence here of prior crimes, wrongs or acts, we conclude that its introduction did not render Hopkinson's trial fundamentally unfair.

---

**5.** Wyo.R.Evid. 404(b), which is identical to Fed.R.Evid. 404(b), provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**6.** Hopkinson cites *United States v. Schwartz,* 790 F.2d 1059 (3d Cir.1986), for the proposition that the prosecution had a duty to specify the purpose for which the bad act evidence was offered. We do not read *Schwartz* or any other authority to require such specificity when, as here, defense counsel does not move at trial to compel the prosecution to so specify. We therefore reject the suggestion.

**7.** Because the reviewing state court considered the merits of the objection rather than disposing of the objection on procedural grounds, the "cause and prejudice" standard of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), does not apply. *Ulster County Court v. Allen,* 442 U.S. 140, 147–54, 99 S.Ct. 2213, 2219–23, 60 L.Ed.2d 777 (1979); *Hux v. Murphy,* 733 F.2d 737, 739 (10th Cir.1984), *cert. denied,* 471

U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985), *overruled on other grounds, Wiley v. Rayl,* 767 F.2d 679, 681 n. 2 (10th Cir.1985). This is so even though the state court considered the merits only to determine whether plain error occurred. *Brasier v. Douglas,* 815 F.2d 64, 65 (10th Cir.) (per curiam), *cert. denied,* ⸺ U.S. ⸺, 107 S.Ct. 3271, 97 L.Ed.2d 769 (1987); *Hux,* 733 F.2d at 739; *see Engle v. Isaac,* 456 U.S. 107, 135 n. 44, 102 S.Ct. 1558, 1575 n. 44, 71 L.Ed.2d 783 (1982).

Although this court has held that the improper admission of evidence of prior crimes, wrongs or acts cannot be harmless error in direct appeals of federal convictions, *see United States v. Biswell,* 700 F.2d 1310, 1319 (10th Cir. 1983), that standard does not govern in a habeas corpus review of a state court evidentiary ruling. In a habeas action, the inquiry is not whether the state court has properly applied its own rules of evidence, but whether errors of constitutional magnitude have been committed. The state court is the final arbiter of state rules, and we must uphold its ruling unless the state evidentiary rule itself denies defendants due process. *Manning v. Rose,* 507 F.2d 889, 892–95 (6th Cir.1974).

Most of this evidence came in to illustrate the intensity of the disputes between Hopkinson and Vehar, and therefore helped to establish a motive for Hopkinson to kill Vehar. For example, the evidence of the 1974 dispute between the Hopkinson family and the Sweat family, including Arlene Sweat's testimony describing Joe and Mark Hopkinson's assault of her father, VIII–E R. 394–96, was relevant to Hopkinson's motive to kill Vehar, because Vehar represented the Sweats in this dispute, see VIII–E R. 389–92, 405–06.

The evidence of Hopkinson's attempt to bribe board member Kenneth Near to testify for Hopkinson in a lawsuit he planned to file against the sewer board, VIII–D R. 256–59, was relevant to show the background and intensity of the dispute between Hopkinson and the sewer board. It thus helped to establish Hopkinson's motive to kill the board's attorney, Vehar.

■ Roger Coursey's testimony was relevant to all four murder counts. Coursey, a narcotics agent who investigated Hopkinson in an undercover capacity in early 1977, testified that Hopkinson offered to supply him with a driver "to bring certain [illegal] articles into Wyoming from out of state," VIII–E R. 587, and that Hopkinson identified Green as a driver who would be good at performing such a task. *Id.* at 589. Although this testimony, by alluding to Hopkinson's unrelated criminal activity, potentially prejudiced Hopkinson, the prejudicial impact of this testimony did not clearly outweigh its probative value. The evidence that Hopkinson could arrange for Green to transport illegal articles was relevant to show that Green might have had knowledge of illegal activity by Hopkinson. As such, this evidence would be relevant to show a motive for Hopkinson to kill Green just before Green was scheduled to testify before a grand jury. Coursey also testified that Hopkinson told him, "if we wanted someone ripped off [sic] that he could have it done and we could have these individuals fucked up bodily for life or we could just fuck them up a little bit or not hurt them at all." VIII–E R. 590. Hopkinson said that dynamite or explosives could be used to achieve those ends. *Id.* at 591. These statements were admissions by Hopkinson that he could arrange for people to be injured by the use of explosives, and thus were relevant to the Vehar murder charges.

■ The admission of other evidence, even if error, was harmless beyond a reasonable doubt. Evidence twice came in of an assault on J.R. Goo, a member of the Bridger Valley Sewer Board. This evidence was first introduced through the testimony of William Roitz, another member of the board, as background showing why a sewer board meeting was canceled. VIII–D R. 204–06. Goo later testified, as well, that he was beaten. VIII–E R. 342–43. Hopkinson argues that because no evidence at trial directly connected him with the assault of Goo, and because the jury could have inferred that Hopkinson had orchestrated the assault, this testimony rendered the trial unfair. Even if the jury improperly concluded that Hopkinson had Goo assaulted, however, the prejudice that would have resulted from this conclusion was insignificant in comparison to all of the properly admitted evidence of Hopkinson's guilt.

Hopkinson's prior trial for marijuana possession was mentioned twice in the testimony of Donley Linford, Green's former attorney. VIII–I R. 927, 929. Both references were made to establish the approximate time that certain conversations took place between Green and Linford. The prejudicial impact in a murder trial of these two statements was miniscule. Likewise, Hap Russell's testimony that Hopkinson placed a few bets with Russell and that Hopkinson knew that Russell's activity was illegal, VIII–K R. 1340–41, 1343–44, did not greatly prejudice Hopkinson and was relevant as background to establish both the relationship between Hopkinson and Russell and that Hopkinson might have turned to Russell for help in procuring the murder of Jeff Green. Kristi King's testimony that Hopkinson was associated from 1971 to 1973 with Richard Taylor, a "con man," VIII–L R. 1610–14, was also not unduly

prejudicial to Hopkinson, even though its relevance was doubtful.

Jim Phillips' admission that it was unethical for him to represent Hopkinson in the dispute with the sewer board while Phillips was county attorney, VIII–F R. 614–15, did not prejudice Hopkinson. Likewise, evidence that Vehar represented Hopkinson's mother in a divorce proceeding and an involuntary commitment proceeding of Hopkinson's father to a mental institution, VIII–D R. 156, did not unfairly prejudice Hopkinson and was relevant to show a possible motive for Hopkinson to kill Vehar.

■ Hopkinson also objects to the admission of Harold James Taylor's testimony that Hopkinson solicited Taylor to telephone George Mariscal in Phoenix about money that Mariscal · owed Hopkinson. VIII–F R. 714–16. The court, however, issued a limiting instruction with respect to this testimony,[8] and we cannot see how its admission unfairly prejudiced Hopkinson.

In sum, most of the evidence objected to here was properly admitted. Those items whose relevance was questionable or improper separately and collectively constituted such a minor part of the trial that the evidence could not have prejudiced Hopkinson unfairly.

### B. Joinder of Conspiracy Charge

■ Hopkinson complains that it was error to join in his murder trial the count charging him with conspiracy with Harold James Taylor to murder Vehar. Hopkinson first alleges that there was no evidence before the grand jury of a conspiracy with Taylor to commit murder; thus, he argues, it should not have returned a count alleging such a conspiracy. Hopkinson would

have us dismiss the indictment on the Taylor conspiracy count even though he was convicted at trial on this count. We cannot agree. The sufficiency of evidence supporting a grand jury's indictment cannot be challenged in a federal post-conviction habeas corpus proceeding. *Tijerina v. Estelle,* 692 F.2d 3, 6 (5th Cir.1982).

■ Alternatively, Hopkinson asserts that even if the indictment was returned properly, the Taylor conspiracy count should not have been joined with the other counts at trial. Joinder of offenses in criminal proceedings in Wyoming state court is governed by Wyo.R.Cr.P. 11(a), which allows joinder of two or more offenses if they are "of the same or similar character or are based on the same act or transaction, or on two (2) or more acts or transactions connected together or constituting part of a common scheme or plan." Wyo. R.Cr.P. 13 allows a defendant or the state to move for severance; on a motion for severance the burden is on the movant to demonstrate that a joint trial would result in such prejudice that a fair trial would be denied. *Dobbins v. State,* 483 P.2d 255, 259 (Wyo.1971). Because the count charging Hopkinson with conspiracy with Taylor to kill Vehar was so related to the counts charging Hopkinson with the murders of the Vehars, joinder was proper; the state trial court, in denying the motion, did not abuse its discretion in a manner affecting the fundamental fairness of the trial. *See United States v. Dickey,* 736 F.2d 571, 591 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

### C. Hearsay and the Confrontation Clause

Hopkinson contends that the introduction into evidence of out-of-court statements of

---

**8.** Hopkinson claims that the trial court's limiting instructions with respect to the Rule 404(b) evidence were improper. The court instructed the jury that the evidence of prior crimes, wrongs or acts "is received by you for a limited [purpose] of showing motive, opportunity, intent, preparation, plan, identity, absence of mistake or accident *and those kinds of things."* VIII–F R. 715 (emphasis added). The trial court used the same instruction with respect to other Rule 404(b) evidence.

We hold that the trial court's addition of the phrase "and those kinds of things" to the enumerated purposes for which 404(b) evidence may be received did not violate Hopkinson's Fourteenth Amendment due process rights. Due process does not constrain a trial court to the language of the rules of evidence in issuing limiting instructions to the jury.

murder victims Vehar and Green violated his rights under the Confrontation Clause of the Sixth Amendment.[9]

■ In a habeas corpus proceeding, we need not address whether hearsay evidence was properly admitted under the Wyoming Rules of Evidence or whether admission would have been proper under the Federal Rules of Evidence; rather, our inquiry is limited to determining whether the admission of hearsay evidence deprived Hopkinson of his rights under the Sixth Amendment to confront and cross-examine the witnesses against him. These rights are fundamental to our Constitution and made applicable to state proceedings by the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed. 2d 923 (1965). In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court analyzed the relationship between the Confrontation Clause and the hearsay rules of evidence and established the following general approach:

> "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."

*Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. "[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process

in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970) (quoting *California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970)).

■ All of the hearsay Hopkinson challenges was found by the Wyoming Supreme Court to have been admitted properly under the "catch-all" exception of Wyo. R.Evid. 804(b)(6), which is identical to Fed. R.Evid. 804(b)(5). *Hopkinson I,* 632 P.2d at 127–37.[10] Because this provision is not a "firmly rooted hearsay exception," *see United States v. Marchini,* 797 F.2d 759, 764 (9th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); *United States v. Barlow,* 693 F.2d 954, 964 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), reliability sufficient to satisfy the Confrontation Clause is not demonstrated merely by showing the evidence was properly admitted under Wyo.R.Evid. 804(b)(6) or that it would have been proper under Fed.R.Evid. 804(b)(5). Conversely, admission of the evidence in violation of the Wyoming rules would not of itself constitute a violation of the Confrontation Clause. *California v. Green,* 399 U.S. at 156, 90 S.Ct. at 1934; *Barker v. Morris,* 761 F.2d 1396, 1400 (9th Cir.1985), *cert. denied,* 474 U.S. 1063, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986); *Rado v. Connecticut,* 607 F.2d 572, 578 n. 4 (2d Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980).

The first aspect of the *Roberts* analysis—the unavailability of the declarant to testify at trial—is easily met here since

---

9. In his brief Hopkinson also challenges the admission of hearsay statements of Kelly Wyckhuyse and Jamey Hysell, as related by Mike Hickey at trial. VIII–F R. 783, 786, 790. We do not see how these statements, which concerned the murder of Kelly Wyckhuyse and which did not implicate or even refer to Hopkinson, prejudiced Hopkinson.

We also need not discuss in detail a number of other statements Hopkinson now challenges. These statements were not admitted for the truth of matters contained therein, were not prejudicial to Hopkinson, or were not objected to at trial. Accordingly, we will confine our

discussion to the hearsay statements of Vehar and Green which at least arguably implicate Hopkinson's confrontation clause rights.

10. The state trial court admitted some of the hearsay under the state-of-mind exception, Wyo. R.Evid. 803(3). On direct appeal, the Wyoming Supreme Court held that this exception did not apply to the hearsay, and relied instead upon the "catch-all" exception, Wyo.R.Evid. 804(b)(6). *Hopkinson I,* 632 P.2d at 128–30. We agree that the state-of-mind exception to the hearsay rule does not justify the admission of this evidence.

both of the declarants, Vehar and Green, were dead. The second aspect of the *Roberts* analysis—whether the declarants' statements bear adequate "indicia of reliability"—requires more attention. We turn to this question.

### 1. Vehar's Out-of-Court Statements

■ Testimony at trial related Vehar's statements that he was afraid of Hopkinson, that he feared for his life, and that Hopkinson had threatened him. Specifically, Hopkinson objects to the following: (1) John Troughton's testimony that Vehar told him that Hopkinson threatened Vehar, VIII–D R. 134; (2) Dorothy Price's testimony that Vehar told her that Hopkinson had threatened him, VIII–F R. 658; (3) Ted Taylor's testimony that Vehar told him that Hopkinson had threatened Vehar, VIII–F R. 691–92; (4) the testimony of Vehar's surviving son, Tony, that Vehar feared for his own safety due to the sewer board's lawsuit against Hopkinson, VIII–I R. 845–47; (5) Price's testimony that Vehar asked then-prosecutor Jim Phillips to file a complaint against Hopkinson for Hopkinson's assault of Frank Roitz, VIII–F R. 659–61; and (6) Price's testimony relating a telephone call that Vehar placed to the Wyoming Attorney General's office. VIII–F R. 662–64.

Vehar's out-of-court statements that Hopkinson threatened him and that he feared Hopkinson possess sufficient "indicia of reliability" to satisfy the Confrontation Clause. Five witnesses—Troughton, Price, Taylor, Tony Vehar, and Phillips—each testified to the same effect: Vehar told them that Hopkinson threatened him or that he had reason to fear Hopkinson. This demonstrates beyond a reasonable doubt that Vehar made the statements and corroborates that he did in fact fear Hopkinson. That Vehar feared for his safety was corroborated further by his own actions and appearance. Every day for three months Vehar would wait in the doorway of his office before crossing the street to Taylor's bar until Taylor, an ex-prize fighter, could see him. VIII–F R. 689–70. Shortly before his death, Vehar started making investments to prepare for his wife's future—something "he had never done before," according to his son, Tony. VIII–I R. 844–45. His secretary, Price, testified that although Vehar "didn't frighten easily," he was "white as a sheet" out of fear. VIII–F R. 657–58.

Such independent corroboration is an important indicium of reliability in Confrontation Clause analysis. *See, e.g., United States v. Roberts*, 583 F.2d 1173, 1176–77 (10th Cir.1978), *cert. denied*, 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 49 (1979); *Berrisford v. Wood*, 826 F.2d 747, 750 (8th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 722, 98 L.Ed.2d 671 (1988); *Barker*, 761 F.2d at 1402; *Barlow*, 693 F.2d at 965; *Rado*, 607 F.2d at 580. When out-of-court statements are corroborated as extensively as here, the corroboration alone may be sufficient to guarantee that the statements were trustworthy. We note several additional particularized guarantees of trustworthiness in Vehar's statements: Vehar had personal knowledge of the matters about which he spoke, *see Barker*, 761 F.2d at 1402; *United States v. McManaman*, 653 F.2d 458, 461 (10th Cir.1981); the statements concerned recent events, *see id.;* he volunteered the statements, *see Barker*, 761 F.2d at 1401; and there is no reason to suspect that he was not telling the truth, *see United States v. Chappell*, 698 F.2d 308, 313 (7th Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

Similarly, Hopkinson's Confrontation Clause rights were not violated by Price's testimony about Vehar's request on behalf of Frank Roitz that the prosecutor file charges against Hopkinson for assault and battery; Arlene Sweat's testimony corroborated much of the substance of the statements. Sweat testified that she and Roitz had consulted with Vehar shortly after the assault, VIII–E R. 404–05; that Phillips refused to press charges against Hopkinson, *id.* at 405–06; and that Phillips was also representing Hopkinson in a civil matter, *id.* at 407.

■ Finally, assuming *arguendo* that Price's testimony about Vehar's telephone conversation with the Wyoming Attorney

General's office in which Vehar stated, "there's going to be a killing in this area, you carrying [sic] it on your conscious [sic] because I'll not carry it on mine," VIII–F R. 662, did not in fact refer to Hopkinson, see II R. tab 48, Exhibit K (ATF report produced by Hopkinson after trial indicating that this statement did not refer to Hopkinson), no new trial is required. Any error in admitting that statement was harmless beyond a reasonable doubt. See *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (harmless error analysis applies to Confrontation Clause errors). Five witnesses testified that Vehar told them that Hopkinson had threatened him. Furthermore, the evidence of the threats was only a minor part of the prosecution's case. Hopkinson's motive to kill Vehar was also demonstrated by the evidence of the many disputes between Hopkinson and parties represented by Vehar. And Michael Hickey, the person who actually killed Vehar, testified in detail about Hopkinson hiring him to do so.

### 2. Green's Out-of-Court Statements

■ Hopkinson similarly objects to the introduction of murder victim Green's out-of-court statements. The most damaging of these statements were those that Green believed that he would be killed if he testified against Hopkinson. As was true with the Vehar hearsay, these statements were corroborated by the testimony of several witnesses. Green's former attorney, Donley Linford, VIII–I R. 917–18, 933–34, 952, and Green's sister, Judy Jensen, VIII–J R. 1003–09, both testified that Green expressed fear that he would be killed if he testified contrary to Hopkinson's wishes in Jamey Hysell's murder trial. See *United States v. Vretta*, 790 F.2d 651, 659 (7th Cir.) (that declarant told several persons, including two disinterested third parties, about threats lent credibility to fact that

declarant had stated he had been threatened), *cert. denied*, 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986). Furthermore, Bill Blair, who was then a special agent with the federal Bureau of Alcohol, Tobacco and Firearms, testified that Green refused relocation under a federal witness protection program because "[Green] figured they could get him any time they wanted to no matter where he was." VIII–K R. 1194. That Green feared for his life was corroborated by his action in attempting to purchase life insurance the day before he disappeared. See VIII–H R. 1340–42.

It is true that Green's recantation of testimony at the Hysell trial calls his credibility into question. However, Green's prior inconsistent statements about Hysell were explained by the fact that Hopkinson and Hickey had directed Green to implicate Hysell. See VIII–G R. 1093–1103 (testimony of Michael Hickey).[11] Green had no similar motive to lie about his fear of Hopkinson; if anything, his sense of impending death may have made his testimony more reliable. See *Barker*, 761 F.2d at 1401. More importantly, the fact that Green had recanted prior inconsistent statements came before the jury. Thus, the jury had a sufficient basis for judging Green's credibility, even though he was not present for cross-examination. See *Dutton*, 400 U.S. at 89, 91 S.Ct. at 220 (plurality opinion); *Roberts*, 583 F.2d at 1176.

■ Further, even if the admission of Green's out-of-court statements about Hopkinson asking him to figure out how to bomb Vehar's car or kill Vehar violated the Confrontation Clause, see VIII–I R. 926–28, any such error was harmless beyond a reasonable doubt. Hopkinson's motive to kill Vehar had been demonstrated by overwhelming evidence, and his involvement in Vehar's death was established by the testi-

---

11. Hopkinson raises a Confrontation Clause challenge to the admission of Green's out-of-court statements that Green's prior statements implicating Hysell were lies manufactured by Hickey, Hopkinson and himself and that his testimony at the Hysell trial was true. This factual issue is collateral to the issue of Hopkin-

son's guilt, but it is important to the issue of Green's credibility. We find sufficient corroboration from the record of Green's out-of-court statement to hold that the Confrontation Clause was not violated by the admission of the hearsay statements.

mony of Hickey, the man who actually killed Vehar.

### 3. Green's Testimony at the Hysell Trial

■ Finally, we discuss the propriety of admitting Green's testimony from the trial of Jamey Hysell for the murder of Kelly Wyckhuyse. The essence of the testimony, according to Donley Linford, who was Green's attorney at that time, was that Michael Hickey, not Hysell, had killed Wyckhuyse. *See* VIII–I R. 934. Because Hopkinson was not a party to this trial, this testimony would not be admissible under the former testimony exception to the hearsay rule in Wyo.R.Evid. 804(b)(1), which is identical to Fed.R.Evid. 804(b)(1). *See United States v. Feldman,* 761 F.2d 380, 384–87 (7th Cir.1985).

The portions of Green's testimony from the Hysell trial introduced into evidence and read to the jury included several statements damaging to Hopkinson with respect to the Vehar murders, *see* VIII–I R. 947–48, and other prior acts of Hopkinson, *see* VIII–I R. 937–46. This testimony might present Hopkinson with a colorable Confrontation Clause claim had it been offered for the truth of the matters contained in Green's statements—for example, that Hopkinson wanted Vehar killed. *See Mattes v. Gagnon,* 700 F.2d 1096, 1100–04 (7th Cir.1983) (admission of testimony from prior unrelated criminal trial violated defendant's Confrontation Clause rights). But the trial court instructed the jury that the testimony was admitted only to prove that Green had made the statements, VIII–I R. 935, a nonhearsay purpose. As the Supreme Court held in *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985), the nonhearsay use of an out-of-court statement does not violate the Confrontation Clause. *See also Dutton,* 400 U.S. at 88, 91 S.Ct. at 219 ("Neither a hearsay nor a confrontation question would arise had Shaw's testimony been used to prove merely that the statement was made.").

Indeed, considering the delicate situation, it is difficult to see what else the trial court should have done. As in *Street,* the nonhearsay use of this evidence was critical to the prosecution's case. *See* 471 U.S. at 413–16, 105 S.Ct. at 2081–83. Evidence that Green had presented testimony in an earlier trial implicating Hopkinson was crucial to demonstrate that Hopkinson might believe that Green would testify against him before the grand jury investigating the Vehar murders. Thus, this evidence was extremely probative on the issue of Hopkinson's motive to order the killing of Green.

If the instant trial had been only for the murder of Green, Green's testimony at the Hysell trial clearly would have been admissible. The possibility that this testimony might unfairly prejudice Hopkinson resulted from the joinder of the Vehar murder counts in the same trial with the Green murder count, which joinder Hopkinson does not challenge. To mitigate the potential for prejudice the court instructed the jury not to use the evidence for a hearsay purpose. This was sufficient to protect Hopkinson's rights under the Confrontation Clause. *See Street,* 471 U.S. at 415 n. 6, 105 S.Ct. at 2082 n. 6 ("The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue."). Furthermore, even if the jury disregarded the court's instruction and considered Green's testimony as proof that Hopkinson had planned to kill Vehar, the prejudicial effect of such evidence would have been very slight. Hickey, the prosecution's primary witness, had previously testified in detail about Hopkinson's plans to kill Vehar and about carrying out the actual murder at Hopkinson's direction.

### D. Ineffective Assistance of Counsel

■ Hopkinson argues that he was denied a fair trial at the guilt stage because of the ineffective assistance of his counsel.[12] In *Strickland v. Washington,* 466

---

**12.** On a preliminary procedural issue not noted by the parties, we hold that Hopkinson's failure

to present the argument to the Wyoming Supreme Court on direct appeal of his conviction

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a two-part test for determining whether a criminal defendant's representation was constitutionally ineffective. First, the defendant must show that counsel's performance was deficient—that is, "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. In making this assessment, "scrutiny of counsel's performance must be highly deferential.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. at 2065. Once the defendant has established that counsel's performance was deficient, he must then show that this deficiency prejudiced his defense—that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. The defendant must meet both of these requirements to establish a claim of ineffective assistance of counsel. *Id.* at 697, 104 S.Ct. at 2070; *Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir.1986), *cert. denied* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). Because "a state court conclusion that counsel rendered effective assistance is not a finding of fact," *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070, we review de novo the merits of Hopkinson's claim.

▮ Hopkinson asserts that his attorneys at the first trial, Robert Van Sciver and Edward Brass, who were not appointed counsel but were selected and paid by Hopkinson, were inadequate in the following ways: (1) they failed to prepare adequately for trial; (2) they failed to object to inadmissible evidence and to prosecutorial and judicial misconduct; and (3) "Van Sciver was obviously intimidated by the prosecution," Brief for Petitioner–Appellant at 141.

Most of the specific allegations of counsel's unpreparedness are based on Van Sciver's statements during a discussion in chambers immediately after his opening statement to the jury. The trial judge, who was present during all of this discussion, made the following assessment of Van Sciver's preparation:

> "[T]here was a time when Mr. Hopkinson said to me in this room that he was concerned about Mr. Van Sciver representing him because he didn't know if he had had enough time to prepare. It is now obvious to the Court that Mr. Van Sciver has been doing his homework and he is well prepared. And I will not ask the Defendant, but my feeling is that the Defendant certainly knows that."

VIII–D R. 59. After reviewing the entire transcript of the trial, and carefully considering Hopkinson's specific allegations of unpreparedness by his trial counsel, we conclude that Van Sciver and Brass were indeed adequately prepared.

We have reviewed each of the instances called to our attention in which defense counsel failed to object to evidence or failed to request a limiting instruction. We disagree with Hopkinson's claim that these omissions were "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. The record demonstrates that Hopkinson has greatly exaggerated the extent of and possible prejudicial effect resulting from the omissions identified. In fact, the defense counsel actively raised evidentiary objections throughout the trial.

We also find no support in the record for Hopkinson's assertion that his counsel was "obviously intimidated by the prosecution" and that "the overbearing and intimidating tactics of Special Prosecutor [Gerald] Spence and the circumstances surrounding the trial rendered defense counsel Van Sciver impotent as an effective advocate on Hopkinson's behalf." Brief for Petitioner–

does not bar our consideration of the claim in a habeas proceeding. Hopkinson's trial counsel also represented him on direct appeal. As we could not expect counsel in that situation to attempt to prove their own incompetency, there

is good cause for the issue not having been raised until after the direct appeal. *See Alston v. Garrison,* 720 F.2d 812, 816 (4th Cir.1983), *cert. denied,* 468 U.S. 1219, 104 S.Ct. 3589, 82 L.Ed.2d 886 (1984).

Appellant at 143. Even if Van Sciver was intimidated by his adversary, his representation of Hopkinson did not fall below the "objective standard of reasonableness" that we must apply under *Strickland.* We disagree with Hopkinson's assertion that Van Sciver "yielded his advocacy," *id.* at 148, by apologizing to the jury for overstating certain facts in his opening statement. VIII–N R. 1942. It was reasonable trial strategy for Van Sciver to admit to the court and the jury that certain overstatements had been made in order to defuse the prosecutor's earlier criticism of these overstatements.[13]

In sum, because the record adequately demonstrates that Hopkinson's representation at trial met the *Strickland* standard for effectiveness, we affirm the district court's dismissal of this claim without an evidentiary hearing. *See Hopkinson VIII,* 645 F.Supp. at 422.

### E. Prosecutorial Misconduct

Hopkinson alleges several acts of misconduct by special prosecutor Gerald Spence during the guilt stage of the trial. We will first discuss some of the allegations that lack merit.

■ Hopkinson asserts that the prosecutor committed misconduct by calling John Suesata to testify, knowing that Suesata would assert a Fifth Amendment privilege. As a general proposition it is misconduct for a prosecutor to present a witness knowing that the witness will refuse to testify, *see United States v. Coppola,* 479 F.2d 1153, 1159–61 (10th Cir.1973). The record, however, demonstrates that the prosecutor was aware only that Suesata planned to claim a Fifth Amendment privilege with respect to certain lines of questioning. *See* VIII–L R. 1582–83, 1586–88. After discussing the matter at the bench, the trial court allowed Suesata to be called to the stand. Only then did it become apparent that Suesata would refuse to tes-

tify about virtually anything. *See id.* at 1596–97, 1601–04. Because the prosecutor quickly terminated the questioning, we see nothing improper with his conduct. *Cf. United States v. Harper,* 579 F.2d 1235, 1240 (10th Cir.) (prosecutor did not commit misconduct by calling witness who asserted privilege when prosecutor did not know definitely that witness would not testify), *cert. denied,* 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427 (1978).

■ Nor do we agree with Hopkinson's contention that it was improper for the prosecutor, in closing argument, to say, "And so they went to good old reliable Johnny Suesata, of course. You saw him. You at least got to look at him." VIII–N R. 1803. It is improper for counsel to comment in closing argument about a witness's exercise of a privilege, *Coppola,* 479 F.2d at 1161; but we do not construe this statement as an impermissible comment upon Suesata's refusal to testify.

■ We do not find misconduct in the prosecutor's reference to the grand jury which investigated the Vehar murders as "the Spence grand jury, our grand jury." This statement merely identified for the jury the particular grand jury investigation, among several, to which the prosecutor was referring.

■ We are troubled, however, by several statements that prosecutor Gerald Spence made in closing argument. In arguing the issue of Hopkinson's guilt, he made comments that arguably played upon the security precautions taken at trial:

"[Hopkinson] played by his own rules. That's the weapon of the criminal. The weapon of fear, the weapon of violence, the weapon of murder, the weapon of bribery, the weapon of perjury, and Vincent Vehar stood his ground and he died. *He didn't have any guards like we have. He had no protection.* He was power-

---

**13.** Hopkinson claims that Van Sciver's argument to the jury in the death penalty phase of the first trial was ineffective. The death sentence imposed after this argument was vacated, *see Hopkinson I,* 632 P.2d at 172, and Hopkinson was subsequently resentenced.

Hopkinson could suffer no continuing prejudice from this aspect of the first trial, and we therefore dismiss this argument as irrelevant.

less and he died. Just simply *died because he had no such weapons.*"

VIII–N R. 1788–89 (emphasis added). Although the fact that security personnel are present and conspicuous to a jury is not always "inherently prejudicial," *Holbrook v. Flynn,* 475 U.S. 560, 572, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986), every precaution should be taken to prevent the presence of security from tainting a jury's proper consideration of the defendant's guilt or innocence. Thus, any prosecutorial argument purposefully capitalizing on the presence of security at trial is improper.[14]

▇▇▇ The prosecutor also alluded to his own friendship with murder victim Vehar, and he incorporated personal observations of Vehar's character:

"They [the "little people" of society] had the rights and Vincent Vehar stood for those right [sic], ladies and gentlemen, *and I was proud of him.* He wasn't going to waiver [sic] one inch. *I never knew him to.* And that was our Vincent Vehar who knew what it was to be powerless, and who knew what it was to be little, and to be rejected, and who knew what it was to be pushed around by those who had power."

VIII–N R. at 1786 (emphasis added). References to the prosecutor's own observations of the victim's character constitute improper argument. A prosecutor should not assert his personal knowledge of the facts, except when testifying as a witness. A.B.A. Model Code of Professional Responsibility DR 7–106(C)(3) (1981); A.B.A. Standards Relating to the Administration of Criminal Justice Standard 3–5.9 (2d ed. 1979). *See United States v. Cardarella,* 570 F.2d 264, 267 & n. 2 (8th Cir.), *cert. denied,* 435 U.S. 997, 98 S.Ct. 1651, 56 L.Ed.2d 87 (1978).

▇▇▇ The prosecutor also conveyed his personal knowledge of Green's involvement in the investigation of the Vehar murders. We quote from the closing argument:

"The dominos were going down and Mark Hopkinson was now in prison and was desperate, and he was desperate.

Where is Green? Where is Green, he would say. What is he doing? What is he up to? Who is he seeing? What is he doing in Jackson? Who is he talking to in Jackson? What is he saying in Jackson? The telephone barrage has started in Lompoc prison, over a hundred calls, and the Grand Jury in Uinta County, the Spence Grand Jury, our Grand Jury was about to meet and he was now in a form of panic. Green was the chief witness and Green would talk. And Green who was the friend of Mary Margaret's and Green who was the friend and companion now of Mr. Moriarity and who had turned around his life was going to talk to the Grand Jury ....

. . . . .

And when Jeff came to Mary Margaret [Williams, Spence's investigator] and to Eddie [Moriarity, Spence's partner] and talked to them for hours and for days on end, what information had gone from Mike Hickey that would implicate the defendant to Jeff Green and from Jeff Green to the prosecution. [Hopkinson] had to know. Jeff Green had to be stopped....

. . . . .

And then I want you to see a Grand Jury being called by us to try to find out who were appointed as special prosecutors, Eddie and I, by Judge Brown. It was time that a special prosecutor that had no connection with the defendant be appointed. And our principal witness, we had worked with long and hard to find the facts, he had spent days and weeks with Mary Margaret and with Eddie. He was ready to testify and perhaps you knew something about what I

---

14. Hopkinson alleges that additional misconduct occurred when the prosecutor elicited a statement from Michael Hickey that Hickey was wearing a bullet-proof vest. *See* VIII–H R. at 1227–28. We do not address the merits of this claim, as a timely objection was made neither at trial nor to the state courts on direct review or collateral attack. As Hopkinson has not even attempted to establish sufficient "cause" for failing to present this claim to the state courts, we cannot consider this claim on habeas review. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

had been doing in another jurisdiction, in another case. That case was over on a Friday and the Grand Jury was to start on that Tuesday, and our principal witness was found dead and tortured on the Sunday before.

Now, that was the situation. And people are afraid. People in that little community were terrorized. I think you can understand what it might be. Jeff Green was known by everybody. Mark Hopkinson was known by everybody. Everybody knew what was going on. The Grand Jury was meeting and that the principal witness was dead and mutilated. And the witnesses were afraid and our staff were afraid. Let's just face it. And I'm not afraid to tell you that I was afraid....

. . . . .

Jeff started to talk ... and then Vehar, the Vehar Grand Jury, our Grand Jury, Jeff was ready to testify and Hopkinson not knowing what Jeff had told us had to go.... It was a series of tortures to find out what Jeff had told. What Jeff knew. What Jeff had told Mary Margaret. What Jeff had told Eddie.

You know, I know Mary Margaret and Eddie Moriarity, my partner, would never have permitted Jeff to say a word to them had they known he would have gone through that unspeakable torture to find out what he had said to them....

. . . . .

Well, I'll show you what the torture [of Jeff Green] did. The first thing it did is to find out what Jeff Green was told by Mike Hickey and what he knew and what he told Mary Margaret and Eddie."

VIII–N R. 1796, 1798, 1810–11, 1831–32, 1919–20.

While we are troubled by several of the prosecutor's statements in these passages, some of them were supported by the evidence. Although Williams, Moriarity and Green did not testify, Jennifer Larchick testified she told Hopkinson that Green had spoken with Moriarity in preparation for the grand jury investigation of the Vehar murders. *See* VIII–K R. 1226, 1229–30. She also testified that Hopkinson expressed

concern over the grand jury investigation. Therefore, we reject Hopkinson's claim that statements about Green's involvement in the investigation were unsupported by the evidence and were improper expression of personal knowledge by the prosecutor.

Several specific statements, however, had no evidentiary support in the record and therefore constituted improper argument. The prosecutor improperly expressed his personal opinion by stating that he knew that his partner and chief investigator would not have permitted Green to testify had they known Green would be tortured. The statement that the witnesses, the staff and the prosecutor himself were all afraid after Green's death was an improper assertion of the prosecutor's personal knowledge, as was the reference to Green's friendship with Mary Margaret Williams and Ed Moriarity. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *United States v. Latimer*, 511 F.2d 498, 503 (10th Cir.1975).

■ The most serious misconduct occurred during the prosecutor's response, in closing argument and rebuttal, to defense counsel's assertion in opening statement that "[t]he prosecution has prostituted itself ... for Mike Hickey. Mike Hickey has the swingingest deal of all time." VIII–D R. 14. We quote extensively from the portions of the prosecutor's closing argument responding to this charge:

"So we gave immunity to Hickey, huh? Is that wrong? Are we the prostitutes that Mr. Van Sciver has accused us of being? Does that bother you? Let's think about it a little bit together. In the first place, let's assume for just a moment that I am, that Eddie is, that Mary Margaret is, that our staff is, that all the law enforcement officers are, that Judge Brown is, that we are all conspired together and we are all one huge group of prostitutes. And that together we gave Mr. Hickey immunity. Let's assume that for the purpose of the argument. And, by the way, only for the purpose of the argument. Does that mean that Mr.

Hopkinson is innocent? Does it mean that you defend yourself from the murder of 3 Vehars and 1 Green by saying, Spence is a prostitute? The State together is a prostitute? Does it make any difference? Or is it a smoke screen?

It is always, ladies and gentlemen, the ploy of skilled defense attorneys to attack the State and the best defense is sometimes a good offense. The State prostituted itself. Now, we need to look at this matter in retrospect and to judge what was done.

If you think we were wrong, if you think we were wrong, if you believe so, when you come down off the jury duty you can walk into my office and look me in the eye and say, 'I think you prostituted yourself.' I will listen to that and I will respect your judgment if you have come to that conclusion. But it has nothing to do whatsoever with the guilt or innocence of the defendant, and you can see that now, and the Court has told you repeatedly about that. But, you know, I don't like people to say that we prostituted ourselves. That hurts my feelings.

We have contributed, all of us, about 2 years of our lives, scores of people, trying to get justice done for a just cause and I hope you won't feel that we are prostitutes. I don't want any of you to think that way of us. I want you to see this case as it was.

. . . . .

And the evidence is clear that Mr. Hopkinson was the man and Hickey had no reason to kill Vehar. He killed him but for no reason. He was the tool.

Now, you know, I have spent a lot of time in the law, a lot of time thinking about things abstractly like justice, and the thing that always sickens me is when the little man, the one who wasn't really ultimately, morally responsible for what happened is the one who goes to jail or goes to the gas chamber. And the big fish, the big fish go free because they have the money and the power and the position.

Now, the question is: Who in this case was morally responsible? Eddie and I had to sit down and figure that out. We had to sit down and figure it out with the Judge, Judge Brown, and with the prosecution people, and with the Sheriff's office, and with the Grand Jury. Who was morally responsible in this case for Vincent Vehar's death? Was Hickey? Poor old drunken, depraved Hickey had gone out and killed Vincent Vehar, his own lawyer, his own friend. But for Hopkinson, would the death have ever occurred? Vincent would be sitting here with me and I could feel his big, old hand on mine if it hadn't have been any other way.

Too often the little people are prosecuted and the big shots are let go. The ultimate responsibility of this case should be put where it belongs. And if a concession has to be made to the serf to catch the murdering king, the concession should be made. And murdering kings don't like it. And murdering kings call it prostitution.

And I want you to understand, can you see Judge Brown sitting in his robe as fine a man as has ever held a judicial office in this state, sitting where Judge Ranck now sits, making an agreement with Mike Hickey to lie or to make an agreement with Mike Hickey to prosecute and to testify against Mr. Hopkinson in order to save his life, or do you see honorable men saying to Mr. Hickey, we will make an agreement with you in the Vehar case because we want responsibility to ultimately rest where it belongs, but you must tell the truth. The whole truth. And if you don't tell the truth the agreement is void.

. . . . .

By the way, did you feel that Judge Ranck was a prostitute when he granted Hap Russell's testimony so that you could hear at least what his contentions were? Somehow there is a necessity from time to time to do the best that we can for our juries and for justice. And if Judge Brown was a prostitute and if I'm a prostitute because there was immunity granted in order to get the testimony of Hickey and Hap Russell before you, then you have seen prostitution in this court-

room. And you can charge us all with that."

VIII–N R. 1809–10, 1812–14, 1907–08.

Although a prosecutor is entitled to respond to a defendant's attacks on a decision to grant a witness immunity in return for testimony, *see United States v. Borello,* 766 F.2d 46, 56 (2d Cir.1985); *United States v. Segal,* 649 F.2d 599, 603–04 (8th Cir.1981); *United States v. Roberts,* 618 F.2d 530, 535 (9th Cir.1980), portions of the argument exceeded the bounds of proper response. To say that the prosecutors "had to sit down" with a judge, other prosecutors, law enforcement personnel and the grand jury "and figure ... out ... [w]ho was morally responsible in this case for Vincent Vehar's death," VIII–N R. 1812, amounts to testimony by the prosecutor as to matters outside the record. This is improper.

What makes this prosecutorial testimony particularly egregious is that it included the prosecutor's personal opinion on the merits of the case. In effect, the prosecutor stated that he, as well as Judge Brown, other prosecutors, and the sheriff's office, all decided prior to trial that Hopkinson was guilty. Such argument is improper. *See United States v. Rios,* 611 F.2d 1335, 1343 (10th Cir.1979) (prosecutor may not respond to defense counsel's argument by expressing personal opinion of defendant's guilt); A.B.A. Model Code of Professional Responsibility D.R. 7–106(C)(4) (a lawyer shall not assert his personal opinion as to the guilt or innocence of an accused); A.B.A. Standards Relating to the Administration of Criminal Justice Standard 3–5.8(b) (2d ed. 1979) (it is unprofessional for prosecutor to express personal belief "as to the truth or falsity of any testimony or evidence or the guilt of the defendant"); *see also United States v. Prantil,* 764 F.2d 548, 555–56 (9th Cir.1985) (prosecutor may not argue on the basis of "actual or perceived personal knowledge"); *Phelps v. Duckworth,* 757 F.2d 811, 824 (7th Cir.) (prosecutor may not express personal opinion that conviction is "richly deserved"), *rev'd on other grounds,* 772 F.2d 1410 (7th Cir.) (en banc), *cert. denied,* 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985); *Unit-*

*ed States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978) (prosecutor may not imply that government would not have brought the case unless the defendant was guilty).

The Supreme Court, in *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed. 2d 1 (1984), explained why such statements are considered improper:

> "The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. See *Berger v. United States,* 295 U.S., at 88–89 [55 S.Ct. at 633]."

*Id.* at 18–19, 105 S.Ct. at 1048.

This court, in *United States v. Ainesworth,* 716 F.2d 769 (10th Cir.1983), distinguished proper argument that the defendant is guilty from improper expression of personal opinion to the same effect:

> "[A prosecutor] may not, without qualification, express his personal opinion as to certain evidence or that the accused is guilty of the crime charged. Similarly, he may not mention facts not in evidence to support a finding of guilt, he may not personally attest to the credibility of government witnesses or attack the credibility of defense witnesses, nor may he place his own integrity and credibility in issue. However, reversible error does not occur if a prosecutor states that, *on the basis of evidence in the case,* it is his belief that the defendant is guilty.... [As such a remark] is not 'testimonial in nature,' it does not violate due process."

*Id.* at 771 (citations omitted) (emphasis in original). Thus, in this case it would not have been improper for the prosecutor to

argue *from the evidence introduced at trial* that Hopkinson was more morally responsible for the Vehars' deaths than was Hickey. But it was improper for him to declare that he and others aligned with the state had decided before trial that Hopkinson was "the murdering king" and therefore had decided to prosecute Hopkinson rather than Hickey.

■ Despite this repeated, and, at times, serious prosecutorial misconduct, we will not disturb Hopkinson's convictions. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.... [T]he aim of due process 'is not punishment of society for the misdeeds of the [sic] prosecutor but avoidance of an unfair trial to the accused.'" *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963)). We must keep in mind the admonition that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young*, 470 U.S. at 11, 105 S.Ct. at 1044. The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus "is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

To view the prosecutor's statements "in context," we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly "could have tipped the scales in favor of the prosecution." *Robison v. Maynard*, 829 F.2d 1501, 1509 (10th Cir. 1987). We also ascertain whether curative instructions by the trial judge, if given, might have mitigated the effect on the jury of the improper statements. *See United States v. Dickey*, 736 F.2d 571, 596 (10th

Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). When a prosecutor responds to an attack made by defense counsel, we evaluate that response in light of the defense argument. *See Darden*, 477 U.S. at 179, 106 S.Ct. at 2471; *Young*, 470 U.S. at 12–13, 105 S.Ct. at 1045 ("if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction"). Ultimately, we "must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12, 105 S.Ct. at 1045.

In the instant case, we do not believe that the prosecutor's improper statements, when viewed in the context of the entire trial, affected the fundamental ability of the jury to weigh the evidence fairly. It is difficult to convey in an opinion of reasonable length the full strength of the prosecution's case against Hopkinson for these murders, but the proof was overwhelming. When viewed against the substantial mass of evidence linking Hopkinson to the Vehar murders, the prosecutor's isolated reference to the guards at the trial appears to be insignificant, as were his personal observations of Vehar's character. The prosecutor's statements of personal knowledge and opinion about Green's involvement in the investigation into the Vehar murders were also relatively unimportant in the trial. Although the prosecutor's expressions of the feelings of himself and his staff were totally unwarranted, they were not relevant to any of the key factual issues at trial and therefore, we think, not prejudicial.

Finally, several other factors mitigate the prosecutor's statement about his pretrial judgment that Hopkinson was morally responsible for the Vehar murders. First, the comments were in response to defense counsel's argument. That a statement was made in response cannot purge an improper statement of its impropriety, *see Young*, 470 U.S. at 12, 105 S.Ct. at 1045; but it may affect the context in which the jury views the improper statement, *id.* Here, the prosecutor introduced these statements

by recalling the attack by the defense. Thus, the jury was sure to keep in mind the defense's argument—that the prosecution "prostituted itself" by allowing Hickey to escape with lesser punishment—when hearing the prosecution's response that the prosecution, and others, believed Hopkinson rather than Hickey to be morally responsible for the crime. Second, the court instructed the jury repeatedly that counsel's statements were not to be considered as evidence. *See Dickey*, 736 F.2d at 596. Third, Hickey was cross-examined about the fact that he was testifying pursuant to a plea agreement. *See* VIII–H R. 1180–82. Thus, the jury was able to evaluate for itself whether Hickey should have been prosecuted more severely and what effect, if any, that had on Hickey's veracity and Hopkinson's culpability.

### F. Display of Security

Hopkinson next asserts that "an atmosphere of anxiety and fear pervaded the trial proceedings," Brief for Petitioner–Appellant at 162, that he was thereby denied due process, and that the district court wrongfully denied an evidentiary hearing on this question. We perceive that Hopkinson makes three claims in this area: (1) the security measures taken during the trial, particularly the display of bodyguards and security personnel, prejudiced him; (2) the prosecution "intimidated" and "sequestered" two witnesses, Phyllis Snedden and Kristi King, thereby denying defense counsel the opportunity to interview them; and (3) a lawyer and investigator for the defense attempted in the summer of 1984 to interview the jurors in *Hopkinson I* and *Hopkinson II*, but the jurors were "apprehended in their [motel] room" and "were advised to leave town" by unidentified persons. Affidavit of Leonard D. Munker, II R. tab 48, Appendix EE at 6.

Hopkinson asserts a right to an evidentiary hearing on these claims in this habeas action, *see Hopkinson VIII*, 645 F.Supp. at 409–11, even though no evidentiary hearing was held by the Wyoming courts. A federal court may grant an evidentiary hearing only when the habeas petitioner "alleges facts which, if proved, would entitle him to

relief." *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). Conclusory allegations unsupported by specifics are insufficient to require a court to grant an evidentiary hearing, " 'as are contentions that in the face of the record are wholly incredible....' " *Phillips v. Murphy*, 796 F.2d 1303, 1304 (10th Cir.1986) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)).

◼ Concerning his first claim, Hopkinson has failed to allege specific facts demonstrating that a conspicuous display of security personnel at the trial denied him due process. The Supreme Court's decision in *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), forecloses his claim:

> "While, in our supervisory capacity, we might express a preference that officers providing courtroom security in federal courts not be easily identifiable by jurors as guards, we are much more constrained when reviewing a constitutional challenge to a state court proceeding. All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over."

*Id.* at 572, 106 S.Ct. at 1348 (footnote omitted). We do not view the security measures taken in this trial to be "inherently prejudicial," and Hopkinson fails to allege facts which would demonstrate actual prejudice. He does quote some venire members who expressed concern over the security measures, but they were excused for cause. *See* VIII–A R. at 220–24; VIII–B R. at 511–14, 531.

◼ We reject his second claim, which relies on defense counsel Van Sciver's statement that prosecution tactics denied him access to witnesses King and Snedden, as wholly incredible. The trial judge, at

Van Sciver's request, had informed witness Jennifer Larchick that she had the right, but not the obligation, to talk to the defense counsel. *See* VIII–K R. at 1248–49, 1262–67. Had defense attorneys believed during the trial that they were being denied access to King and Snedden, they could have requested similar instructions from the court to those witnesses. But even were we to accept Van Sciver's affidavit and the hearsay contained in other affidavits, we still would deny relief. Hopkinson has failed to demonstrate prejudice from his trial counsel's alleged inability to interview witnesses. No showing has been made here of what information defense attorneys hoped to obtain from those witnesses. At trial, Hopkinson chose to present no evidence on his own behalf. Therefore, it appears that the only advantage he could have gained from interviewing these witnesses was a more informed cross-examination. Hopkinson's claim, therefore, is wholly speculative.

Finally, Hopkinson has not demonstrated how the alleged intimidation of his investigators from interviewing jurors in 1984 has prejudiced his appeals or petitions for postconviction relief.

### G. *Brady* Claims

Hopkinson alleges that the prosecution withheld exculpatory evidence before trial in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.[15] The district court reviewed all of the alleged *Brady* evidence, which was attached to the petition for writ of habeas corpus in the form of appendices. It dismissed the claims without an evidentiary hearing, holding that none of the evidence was material under the standard enunciated in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *See Hopkinson VIII*, 645 F.Supp. at 414–17.

In *Bagley*, the Court established the following test of materiality:

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384 (Blackmun, J., joined by O'Connor, J.); *see also id.* at 685, 105 S.Ct. at 3385 (White, J., concurring, joined by Burger, C.J., and Rehnquist, J.) (approving "reasonable probability" standard).

■ Hopkinson raises one *Brady* claim with respect to evidence that John Suesata had been a government informant, II R. tab 48, Appendices U, V, W and X; that Suesata served as a government informant in February 1982 in investigating Green's murder, I R. tab 1a, Attachments Referencing Points I and VI; and that during a polygraph investigation in December 1981 Suesata denied ever speaking to Hopkinson and denied having knowledge about Green's murder. *Id.* None of Suesata's allegedly undisclosed statements is potentially exculpatory of Hopkinson; further, since Suesata refused to testify at trial and did not testify at the second penalty hearing, this material had no impeachment value.

■ A second claim concerns out-of-court statements by Green which were not introduced at trial. *See* II R. tab 48, Appendices D–1, D–2, D–3, D–6, E–1, G, H, I and J. Hopkinson alleges that the statements demonstrate Green's unreliability "and, thus, were critical in determining the trustworthiness of his out-of-court statements." Brief for Petitioner–Appellant at 209. We agree with the district court that Hopkinson's access to this evidence could not have affected the outcome of the trial. Green's out-of-court statements introduced at trial were not presented to prove the matters contained therein, except for the statements expressing a belief that Hopkinson would kill him. The evidence contained in these exhibits does little to indicate that

---

**15.** Hopkinson also argues that the prosecution wrongfully failed to disclose the details of Michael Hickey's plea bargain. We do not address

the merits of this claim, as it was not presented to the district court.

Green was lying when he told relatives and acquaintences that Hopkinson wanted him dead. At most, it demonstrates that Green would lie to law enforcement officers in order to protect himself or others. Moreover, as the district court noted, "Much of the same information is contained within the record, particularly Jeff Green's inconsistent statements concerning the Wyckhuyse murder[,] and defense counsel was aware of these inconsistencies." *Hopkinson VIII*, 645 F.Supp. at 417.

■■■ Hopkinson most strenuously objects to the district court's dismissal of the claims with respect to II R. tab 48, Appendices E–2, F and K. Appendices E–2 and F are two separate transcriptions of a telephone conversation between Green and his attorney, Ford Bussart, prior to Jamey Hysell's trial for the murder of Kelly Wyckhuyse. During this conversation Green stated that Leonard Hysell had threatened him, that "one of his cousins was trying to kill me ... one of those other fruitcake cousins of the name of Jamie is ... out on the loose, you know," II R. tab 48, Appendix F, at 5; that "I know beyond any unreasonable shadow of a doubt I wouldn't live three days if I testifie[d] against [Jamey Hysell]," *id.;* and that a man had tried to kill Green and Hopkinson but the prosecutor, Jim Phillips, dropped the charges against him, *id.* at 6. Hopkinson argues that this evidence shows that Hysell might have killed Green. However, given the substantial evidence supporting Hopkinson's conviction for the murder of Green and the wholly speculative nature of this evidence, we agree with the district court that this evidence does not satisfy the *Bagley* test.

■■■ Appendix K consists of two federal Bureau of Alcohol, Tobacco and Firearms (ATF) reports summarizing the investigations into the Vehar murders. One report mentions an investigation of four others suspected of committing the Vehar murders. All four were together hours before the bombing occurred; two of them were seen speeding away from the scene of the blast, II R. tab 48, Appendix K at 5, and were stopped by police within a minute after the bombing occurred, *id.* at 6; a third member of the group was reported to have telephoned the Vehar home shortly before the explosion occurred. *Id.* at 5. The reports indicate that the ATF also investigated Harold Whiteley and Jim Phillips in connection with the Vehar bombings, and that Whiteley and Phillips might have had a motive to kill Vehar.

The ATF reports give us some pause because, by naming other suspects, they might have provided an alternative tactic for the defense. But applying the *Bagley* test we are satisfied the reports would not provide enough to undermine confidence in the outcome of the trial. The reports provided suspects only for the *Vehar* bombing. Evidence of the four speeding in the area at the time of the bombing was introduced at trial and the police officer who stopped the car shortly after the bombing testified that the occupants of that car were trying to find a phone to report the bombing to police. VIII–E R. 434–35. But most important is that Hickey confessed that he committed the bombing, and that he was hired by Hopkinson to kill Vehar. And substantial evidence corroborated Hickey's confession to killing the Vehars.

Because Hopkinson has failed to establish that his due process rights to a fair trial were violated, we affirm the district court's refusal to vacate the murder convictions.

IV

*Hopkinson's Challenges to the Death Sentence*

Although the Wyoming Supreme Court affirmed Hopkinson's convictions, it reversed the death sentence for the Green murder because one of the aggravating circumstances found by the jury was not supported by the evidence. *Hopkinson I*, 632 P.2d at 170–72. The court did not independently weigh the valid aggravating circumstances against the mitigating circumstances, but instead remanded the case for a new sentencing trial before a jury. *Id.* at 171–72.

A new jury was chosen and the second sentencing trial began on May 17, 1982. To familiarize the new jury with the circumstances surrounding the murders, the court read excerpts from the Wyoming Supreme Court's statement of facts in *Hopkinson I*, and the parties presented additional evidence through live testimony and excerpts from transcripts of testimony from the guilt phase of the first trial. The jury at the second sentencing trial found the existence of all five aggravating circumstances submitted to it [16] and imposed the death penalty.[17]

We treat in this part all of the issues concerning the second sentencing trial except those relating to the prosecutor's argument based upon *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The two related *Caldwell* issues are treated in Part VIII *post*.

### A. Application of "Heinous, Atrocious or Cruel" Aggravating Circumstance

▮ Hopkinson argues that the United States Constitution prohibits Wyoming from basing his death sentence upon the "especially heinous, atrocious or cruel" aggravating circumstance without a jury finding that he *intended* that Green's killers commit the murder in such a manner.[18] In support, he cites *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), in which the Supreme Court held that the Eighth Amendment prohibits a state from imposing the death penalty upon one convicted of felony murder "but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. Hopkinson urges us to engraft the *Enmund* intent requirement onto the "especially heinous, atrocious or cruel" aggravating circumstance at issue here.

We assume *arguendo* that the Eighth Amendment forbids imposing the death penalty against a mere accomplice as punishment for the cruel nature of a killing, without proof beyond a reasonable doubt that the accomplice intended the killing be cruel.[19] Nonetheless, under the procedural

---

16. The aggravating circumstances found by the jury to exist were the following:

"1. The murder was committed by a person under sentence of imprisonment.
2. The defendant was previously convicted of another murder in the first degree.
3. The murder was committed for the purpose of avoiding or preventing a lawful arrest.
4. The murder was committed for pecuniary gain.
5. The murder was especially heinous, atrocious or cruel."

VI R. 703.

17. The jury found none of the seven mitigating circumstances submitted to it to be present. VI R. 704. The jury did, however, consider two other mitigating circumstances after being instructed by the court to consider "other mitigating circumstances." These were, with the jury's findings, as follows:

"8. The torture of Jeff Green may not have been ordered by Mark Hopkinson. No.
9. *Actions of Mark Hopkinson helped save the life of a prison guard.* Yes."

*Id.* The jury then found that the mitigating circumstances did not outweigh the aggravating circumstances. *Id.* at 705.

18. At the second sentencing hearing, Hopkinson moved to strike the submission of this aggravating circumstance to the jury, arguing that the jury could not apply the aggravating circumstance against him without finding that he had intended, authorized or known that Green would be tortured before being killed. *See* IX–F R. at 1149. The trial court denied this motion and submitted the aggravating circumstance to the jury, *id.* at 1150, which found the aggravating circumstance to exist. *Id.* at 1264.

19. Four dissenting Justices in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), indicated agreement with this position:

"As the Court notes, *ante*, at 146 n. 2, [107 S.Ct. at 1682 n. 2] it has expressed no view on the constitutionality of Arizona's decision to attribute to petitioners as an aggravating factor the manner in which other individuals carried out the killings. On its face, however, that decision would seem to violate the core Eighth Amendment requirement that capital punishment be based on an 'individualized consideration' of the defendant's culpability, *Lockett v. Ohio*, 438 U.S. 586, 605 [98 S.Ct. 2954, 2965, 57 L.Ed.2d 973] (1978). It therefore remains open to the state courts to consider whether Arizona's aggravating factors were interpreted and applied so broadly as to violate the Constitution. *Godfrey v. Georgia*, 446 U.S. 420 [100 S.Ct. 1759, 64 L.Ed.2d 398] (1980)."

*Tison*, 481 U.S. at 160 n. 3, 107 S.Ct. at 1689 n. 3 (Brennan, J., dissenting). *See also Cartwright v. Maynard*, 822 F.2d 1477, 1485 (10th Cir.1987) (en banc) ("an aggravating circumstance must direct the sentencer's attention to a *particular*

guidelines of *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), we must reject Hopkinson's claim. *Cabana* established the following procedure for review of claims under *Enmund:*

"[W]hen a federal habeas court reviews a claim that the death penalty has been imposed on one who has neither killed, attempted to kill, nor intended that a killing take place or lethal force be used, the court's inquiry cannot be limited to an examination of jury instructions. Rather, the court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made. If it has, the finding must be presumed correct by virtue of 28 U.S.C. § 2254(d), see *Sumner v. Mata,* 449 U.S. 539 [101 S.Ct. 764, 66 L.Ed.2d 722] (1981), and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence."

*Id.* at 387–88, 106 S.Ct. at 697–98 (footnotes omitted).

Under this procedure, the Wyoming Supreme Court made adequate findings about Hopkinson's intent to uphold the application of the aggravating circumstance against him. That court, on direct appeal of the death sentence, made the following findings:

"In the appeal before us the evidence is that the first degree murder of Green

was planned by appellant, he intended that the killing take place, he arranged for hired triggermen to do the execution and intended that torture and lethal force be utilized. From the beginning the underlying felony is premeditated murder.

. . . . .

The extensive evidence relating to the aggravating circumstance that the murder was especially atrocious, heinous and cruel, is of the most convincing nature. The evidence of threats against Green and others, the evidence of the character and disposition of appellant to take care of persons with violence, weapons and explosives, and his inquiry about the availability of welding equipment, laid a foundation for the capability of appellant to cause the horrible torture of Green which took place. The photographs of Green's body are expressive even beyond the words of the testimony of the pathologist who detailed for the jury the various brutal wounds inflicted before Green's being put to death."

*Hopkinson II,* 664 P.2d at 58–59. These findings are sufficient in themselves to satisfy any potential *Enmund* problem posed by the "especially heinous, atrocious or cruel" aggravating circumstance in this case.[20]

■■■ Hopkinson argues that even if we accept this finding as adequately addressing his *Enmund* claim, we should not presume it correct because the Wyoming Supreme Court viewed the facts in the light most favorable to the prosecution when it made this finding. Hopkinson contends that:

Jeff Green, the inclusion of the above factor and its specific rejection indicates that the jury was convinced that the torture of Jeff Green was ordered by petitioner and wished to make this point clear."

*Hopkinson VIII,* 645 F.Supp. at 401–02. Because we hold the Wyoming Supreme Court's findings on appeal to be sufficient, we need not decide whether this supplemental jury finding alone would satisfy *Enmund* and *Cabana* beyond a reasonable doubt. More particularly, we do not address the weight to be accorded to such a finding made by the jury *sua sponte* and without specific instruction that the factor had to be found.

---

aspect of a killing that justifies the death penalty") (emphasis added), *aff'd,* —— U.S. ——, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

**20.** The district court relied in part on a supplemental jury finding to uphold the aggravating circumstance. This finding, which was written on the verdict form by the jury under the heading "other mitigating circumstances," was as follows:

"8. The torture of Jeff Green may not have been ordered by Mark Hopkinson.
 Yes___ No _X_ "

VI-H R. 704. The district court said that:

"[r]ather than indicating that the jury had a reasonable doubt concerning the torture of

"[t]he 'light most favorable' standard ... should not be applied in determining whether the jury's finding of aggravating circumstances supports the imposition of the death penalty. This is particularly true when the state's statutory scheme provides for *mandatory* review of the basis for imposition of the death penalty, proportionality, and discretionary sentence review."

Brief for Petitioner–Appellant at 183 (emphasis in original). He argues that because the Wyoming death penalty scheme gives the trial judge no discretion to reduce a death sentence, the Wyoming Supreme Court's application of the light most favorable standard "violates Petitioner's right to automatic sentence review and the assurance that he has been afforded due process of law." *Id.* at 185.

We reject Hopkinson's argument. The Wyoming Supreme Court, of course, has the ultimate authority to decide what "automatic sentence review" means under the law of that state. And *Sumner v. Mata*, 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982), requires us to presume state court factual findings correct. This presumption of correctness extends to a finding by a state appellate court that the evidence, when viewed in the light most favorable to the prosecution, supports a jury's finding that an aggravating circumstance is present. *See Mercer v. Armontrout*, 844 F.2d 582, 584 (8th Cir.1988). A federal court also must accord a presumption of correctness to a state appellate court's determination that the evidence would permit a jury to find the requisite *Enmund* culpability. *Smith v. Dugger*, 840 F.2d 787, 792–93 (11th Cir.1988); *cf. Wingo v. Blackburn*, 786 F.2d 654, 655 (5th Cir.1986) (per curiam) (state court's finding on this issue "is entitled to great weight in our review"), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987).

The record fairly supports the Wyoming Supreme Court's finding that Hopkinson intended that his victim be tortured. Hopkinson does not dispute that the evidence of the extensive torture of Green [21] entitled the jury to conclude that the murder was "especially heinous, atrocious or cruel." [22] The physician who performed the autopsy on Green concluded that this protracted torture must have been premeditated. IX–C R. 667–68. Evidence that Hopkinson arranged, authorized and paid for Green's murder supports the Wyoming Supreme Court's finding that the design for the torture came from Hopkinson and was not merely an unauthorized act by the hired killers. Hopkinson had ample motive to torture Green: to punish Green for testifying contrary to Hopkinson's orders, to learn from Green the extent of his cooperation with law enforcement officials and knowledge of the impending grand jury investigation, and to use Green's brutal

**21.** There was considerable evidence of Green's torture. Galyn M. Stahl, the physician who performed the autopsy on Green's body, concluded that Green was tortured extensively before he was killed by a gunshot to the neck. IX–C R. 672. The most telling evidence of torture was the large number of burns on Green's body. Dr. Stahl estimated that Green was burned approximately 140 times. *Id.* at 657. About half the burns were first- and second-degree burns which appeared to have been caused by cigarettes. *Id.* at 659. Green also suffered a number of extremely painful third-degree burns, which appeared to have been inflicted by a hot metal object. *Id.* at 659–60. Many of these third-degree burns were on his face and scalp. His left eye, which had been touched repeatedly by a hot object, was burned so severely that it hemorrhaged and, had Green lived, would have been irreversibly damaged. *Id.* at 653, 676. His right eye was also burned, though not quite as severely, and his ears were burned extensively. *Id.* at 653, 662. Green also had five shallow knife cuts on his neck and chest and three deep bruises. *Id.* at 658. One bruise was caused by a blunt object being hit against Green's head. *Id.* at 650. It appeared that Green had been tied to a chair or table while being tortured, *id.* at 664–65, and that it must have taken several hours to inflict the burns. *Id.* at 663.

**22.** Hopkinson did not challenge this aggravating circumstance on vagueness grounds. Thus, we do not have before us the issue whether the state has sufficiently focused its definition to avoid the unconstitutional vagueness found in Oklahoma's statute by *Maynard v. Cartwright*, —— U.S. ——, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Torture of the victim is a common acceptable definition of this particular aggravating circumstance.

murder as a harsh warning to other potential grand jury witnesses to remain silent about Hopkinson's involvement in the Vehar murders. Furthermore, some circumstantial evidence supports the view that Hopkinson ordered the torture. Just two days before Green disappeared, Hopkinson asked a neighbor of Green's to determine whether Green had a welder in his garage. IX–D R. 730. Since Green was burned by heated metal, this inquiry permits the inference that Hopkinson was trying to secure equipment the hired killers could use to torture Green. Further, at Hopkinson's direction $15,000 was placed in Kristi King's bank account the day after Green's body was found. IX–C R. 626. Shortly thereafter, a man who identified himself as Joe called King to claim the money, *id.* at 629–30, and Hopkinson called and urged her to take the money to Joe at the San Francisco airport, *id.* at 635. This evidence raises the inference that Hopkinson paid for Green's murder and, in transferring the money the day after Green's body was found, ratified the torturous manner in which Green was killed. In sum, the evidence supports rather than counters the state court finding's presumption of correctness.

### B. Evidentiary Issues

■ Hopkinson raises several arguments about the admission of evidence at the sentencing trial.[23] We do not address any of these claims, as they were not presented to the district court in the petition for writ of habeas corpus or in the petitioner's district court brief. *See* I R. tab 1; II R. tab 48.

### C. Ineffective Assistance of Counsel

■ Hopkinson argues that he was denied effective assistance of counsel at the second penalty hearing in that his newly appointed counsel had not been granted adequate preparation time. He bases his

argument on the five-part test of *United States v. Golub,* 638 F.2d 185 (10th Cir. 1980), *reversed and vacated,* 694 F.2d 207 (10th Cir.1982). Hopkinson's reliance on this test is inapposite, however, as the Supreme Court rejected its approach in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic,* the Court stated, "[t]he criteria used by the Court of Appeals do not demonstrate that counsel failed to function in any meaningful sense as the Government's adversary. Respondent can therefore make out a claim of ineffective assistance *only by pointing to specific errors made by trial counsel.*" *Id.* at 666, 104 S.Ct. at 2051 (emphasis added and footnote omitted). We have held that "[t]he effectiveness of counsel cannot be ascertained solely by the amount of time afforded a defendant to prepare his defense." *United States v. Pearson,* 798 F.2d 385, 388 (10th Cir.1986). Hopkinson has failed to identify any specific errors made by his counsel at the second penalty hearing. Further, our independent review of that hearing has convinced us that Hopkinson's counsel met the *Strickland* test for effectiveness. We therefore reject Hopkinson's claim.

■ In rejecting Hopkinson's claims of ineffective assistance of counsel, we also uphold the district court's denial of an evidentiary hearing on this issue. *See Hopkinson VIII,* 645 F.Supp. at 422. The decision whether to grant an evidentiary hearing is within the discretion of the district court. *United States v. Barboa,* 777 F.2d 1420, 1422 n. 2 (10th Cir.1985). Given Hopkinson's failure to allege any specific actions by his counsel falling below the *Strickland* standard, the district court did not abuse its discretion in denying the motion for a hearing.

### D. Adverse Publicity Before Sentencing Trial

Hopkinson claims that adverse publicity before the second sentencing hearing vio-

---

**23.** He asserts the following errors: (1) evidence of his past criminal conduct was introduced at the sentencing hearing even though it was not directly relevant to the aggravating circumstances enumerated in Wyo.Stat. § 6–2–102(h); (2) the Vehar murder convictions cannot support the aggravating circumstance that "[t]he defend-

ant was previously convicted of another murder in the first degree," Brief for Petitioner–Appellant at 202 (emphasis removed); and (3) at the sentencing hearing Hopkinson was precluded from reopening the factual issues relating to guilt "in an effort to supply evidence of mitigation." *Id.* at 203.

lated his due process rights. First, he asserts that the prosecution brought a groundless indictment against him shortly before the hearing in order to sway public sentiment against him and deny him a fair hearing. Next, he asserts that the jury at the second sentencing hearing was prejudiced against him because of pretrial publicity in general. Finally, he contends prejudice resulting from security precautions at the penalty hearing.

■ Hopkinson alleges that the prosecution coerced Don Hagerman into implicating Hopkinson in an unrelated conspiracy to commit murder and arson. According to Hopkinson's brief, Hopkinson was indicted on this conspiracy charge shortly before the sentencing trial. Brief for Petitioner–Appellant at 228–29; see II R. tab 48, Appendix EE at 2–4. Hopkinson has not presented any evidence to support this allegation of prosecutorial wrongdoing. While he attached to his petition two handwritten letters from Don Hagerman in which Hagerman recanted testimony supporting the conspiracy indictment, see II R. tab 48, Appendix BB, Appendix CC, Hagerman's letters do not state that the prosecution coerced him into testifying against Hopkinson. To the contrary, Hagerman stated that he testified against Hopkinson in order to get revenge and because he was high on drugs. Id., Appendix CC. We affirm the dismissal of this claim.

■ Hopkinson's claim that prehearing publicity biased the jury against him is also without merit. While juror Klerekoper did state during voir dire that he spoke with a juror in Hopkinson's earlier trial, Klerekoper could not recall the substance of that conversation or whether that juror had expressed any feelings about the case. XII–A R. 161. Klerekoper was passed for cause by the defense, id. at 175, and the defense did not use a peremptory challenge to strike him from the panel. All venire members were questioned about pretrial publicity during voir dire, and those who expressed an opinion about the case resulting from such publicity were excused for cause. All of those who served on the jury were passed for cause by the defense coun-

sel. In sum, the record of voir dire does not demonstrate that "the setting of the [sentencing hearing] was inherently prejudicial or that the jury-selection process of which he complains permits an inference of actual prejudice." Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2038, 44 L.Ed. 2d 589 (1975).

■ Hopkinson also objects to the security measures at the sentencing trial, claiming that the display of security at the hearing denied him due process. Hopkinson objects to the following security measures taken at the trial: guards checking with a magnetometer those entering the courtroom, see II R. tab 48, Appendix EE at 4–5; bodyguards for the prosecutor wearing bulletproof vests and carrying guns visible beneath their coats, see id. at 5; and guards audibly cocking their firearms after the lights went out in the courtroom during the trial, see id. After reviewing the record of the sentencing trial, we do not believe that the courtroom security seen by the jurors "was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial," Holbrook v. Flynn, 475 U.S. 560, 572, 106 S.Ct. 1340, 1348, 89 L.Ed.2d 525 (1986). Because such security measures were not inherently prejudicial, and because Hopkinson has not shown actual prejudice, Hopkinson's claim must be dismissed.

## V

### Challenge to Wyoming's Postconviction Procedures

■ Hopkinson attacks Wyoming's postconviction procedures as unconstitutional under the Fourteenth Amendment. Specifically, he asserts that the Wyoming courts' summary denial of his petition for postconviction relief, see Hopkinson IV, 696 P.2d at 61–64, denied him due process because the courts did not allow notice pleading and did not recognize affidavits based only upon information and belief.

Several circuits have held that state postconviction proceedings may not be challenged in federal habeas corpus actions. Bryant v. Maryland, 848 F.2d 492, 493

(4th Cir.1988); *Millard v. Lynaugh,* 810 F.2d 1403, 1410 (5th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 122, 98 L.Ed.2d 81 (1987); *Kirby v. Dutton,* 794 F.2d 245, 247–48 (6th Cir.1986); *Mitchell v. Wyrick,* 727 F.2d 773, 774 (8th Cir.) (per curiam), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Williams v. Missouri,* 640 F.2d 140, 143–44 (8th Cir.), *cert. denied,* 451 U.S. 990, 101 S.Ct. 2328, 68 L.Ed. 2d 849 (1981); *United States ex rel. Curtis v. Illinois,* 521 F.2d 717, 721 (7th Cir.), *cert. denied,* 423 U.S. 1023, 96 S.Ct. 465, 46 L.Ed.2d 397 (1975). *But cf. Dickerson v. Walsh,* 750 F.2d 150, 153–54 (1st Cir.1984) (holding that petitioner's equal protection challenge to state postconviction procedures is cognizable in habeas corpus proceeding, but dismissing the claim because of petitioner's failure to exhaust state remedies). As the Eighth Circuit has stated:

"Even where there may be some error in state post-conviction proceedings, this would not entitle appellant to federal habeas corpus relief since appellant's claim here represents an attack on a proceeding collateral to detention of appellant and not on the detention itself...."

*Williams,* 640 F.2d at 144.

Hopkinson argues, however, that *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), invalidates this line of circuit precedent. In *Evitts,* the Supreme Court held that the Sixth Amendment right to the effective assistance of counsel attaches to those criminal appeals in which a criminal defendant has a constitutional right to counsel. In reasoning to this conclusion, the Court stated that even though the Constitution does not require states to grant appeals as of right to criminal defendants, "if a State has created appellate courts as 'an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts,* 469 U.S. at 393, 105 S.Ct. at 834 (citation omitted) (quoting *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956)). The Court's holding was limited to those criminal appeals in which a defendant has the right to counsel. *Evitts,* 469 U.S. at 396 n. 7, 105 S.Ct. at 836 n. 7. Thus, it appears not to apply to appeals in which no right to counsel exists. *See Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974).

Recently, in *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), the Supreme Court held that the right to effective assistance of counsel does not attach to state proceedings for postconviction relief. If the rule of *Finley* applies to death penalty cases we would have to hold that the federal Constitution does not require the entire array of due process protections to be provided in state postconviction proceedings. *See Finley,* at ——, 107 S.Ct. at 1995 ("the decision below rests on a premise that we are unwilling to accept—that when a State chooses to offer help to those seeking relief from convictions, the Federal Constitution dictates the exact form such assistance must assume."). Thus a claim that procedural errors occurred during the state postconviction proceedings would not rise to the level of a federal constitutional claim cognizable in habeas corpus.

*Finley* was not a death penalty case, however, and the Fourth Circuit has recently held that the state must provide counsel for postconviction state court proceedings in death penalty cases. *Giarratano v. Murray,* 847 F.2d 1118 (4th Cir.1988) (en banc). The Supreme Court has granted certiorari in that case, *see* —— U.S. ——, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988). Thus, we must consider the possibility that the Supreme Court will recognize some due process requirements upon state postconviction procedures in capital cases. Even if that should be the law, we hold that the claim of procedural error in the capital case before us does not rise to the level of a federal constitutional claim recognizable in habeas corpus proceedings. The presence of a procedural deficiency in a state's scheme for postconviction relief like that alleged here does no violence to federal constitutional rights. Even if the state postconviction petition was dismissed arbitrarily, the petitioner can present anew to

the federal courts any claim of violation of his federal constitutional rights. Any deficiency in the state procedure would affect the presumption of correctness accorded the state court's findings. *Ford v. Wainwright,* 477 U.S. 399, 410–11, 106 S.Ct. 2595, 2602–03, 91 L.Ed.2d 335 (1986) (plurality opinion); *id.* at 423–24, 106 S.Ct. at 2609 (Powell, J., concurring); *Townsend v. Sain,* 372 U.S. 293, 316, 83 S.Ct. 745, 758–59, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254(d)(2), (3) and (6). And the federal courts can, as the instant case demonstrates, give an adequate remedy for violations of federal constitutional rights. *See Curtis,* 521 F.2d at 720–21. Accordingly, we uphold the district court's dismissal of this claim.

## VI

### *Access to Post–Trial Grand Jury Transcripts*

■ Hopkinson seeks post-trial discovery of evidence presented to the grand jury that continued to investigate the Green murder even after Hopkinson's conviction for that crime. The Wyoming courts summarily dismissed his motions for such discovery. *See Hopkinson IV,* 696 P.2d at 72; *Hopkinson VII,* 709 P.2d at 407. The Wyoming Supreme Court reasoned:

> "Since we have denied appellant's petition for writ of habeas corpus to which the request for grand jury proceeding [transcripts] was ancillary, there is no pending proceeding and there is no occasion to further consider acting on appellant's request seeking discovery of grand jury proceedings. In *Hopkinson IV,* 696 P.2d at 72, we applied the principle set out in Rule 26(b)(1), W.R.C.P., that before discovery can be initiated, there must be a 'pending proceeding.' The question is res judicata."

*Hopkinson VII,* 709 P.2d at 407. Hopkinson argues that the dismissal of the discovery request on the grounds that he had no proceeding pending in the court violated his constitutional rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In the instant case, Hopkinson was convicted of procuring the murder of Green, but the actual killers of Green were not caught. A grand jury continued to investigate this crime but never returned any indictments. Hopkinson asserts that evidence tending to exculpate him may have been presented to this grand jury, but he cannot point to any specific exculpatory evidence because he has never seen the grand jury transcripts.

In order to obtain access to grand jury testimony, a criminal defendant must establish a "particularized need" for the transcripts. *Dennis v. United States,* 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966); *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959). The issue thus comes down to whether Hopkinson has shown such a need. We think that the Eleventh Circuit's opinion in *Miller v. Wainwright,* 798 F.2d 426 (11th Cir.1986) (per curiam), and the recent Supreme Court opinion in *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), are instructive on this issue.

In *Miller,* two defendants sought to examine the grand jury testimony of witnesses who testified against them at trial but who had given prior statements inconsistent with the trial testimony. The defendants sought access to the grand jury testimony to determine whether the witnesses gave additional inconsistent statements there that might have assisted the defense in impeaching them. Although the defendants could not prove the grand jury testimony to be inconsistent with the inculpatory trial testimony, the Eleventh Circuit ordered an *in camera* review of the grand jury transcripts, stating that "[t]he threshold showing for an *in camera* review is not as high as that needed to obtain the evidence." 798 F.2d at 429–30. An *in camera* inspection was necessary, the court held, to determine whether the defendants could establish a "particularized need" for the testimony sufficient to justify disclosing the transcripts. *Id.*

In *Ritchie,* a defendant charged with child abuse sought discovery of the file of

Pennsylvania Children and Youth Services. (CYS) investigations against him, "because the file might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence." 107 S.Ct. at 995. The Supreme Court upheld the decision of the Pennsylvania Supreme Court ordering an *in camera* review of the CYS file to determine whether the file contained exculpatory evidence. 107 S.Ct. at 1001–02. *See also Miller v. Dugger,* 820 F.2d 1135 (11th Cir.1987) (per curiam) (reinstating the decision in *Miller v. Wainwright,* vacated by the Supreme Court for further consideration in light of *Ritchie* ).

The instant case falls within the ambit of the *Miller* and *Ritchie* rulings. A grand jury continued to investigate a murder for which Hopkinson has been convicted, and for which he has been sentenced twice to die. Exculpatory evidence could have been presented to the post-trial grand jury. Hopkinson's unique position surely constitutes a "preliminary showing of particularized need," *Bary v. United States,* 292 F.2d 53, 56 (10th Cir.1961), and an *in camera* inspection of the materials by the district court is therefore warranted. Such an inspection will protect the state's interest in keeping the grand jury transcripts secret if no particularized need for disclosure is established. *Cf. Ritchie,* 107 S.Ct. at 1004 ("An *in camera* review by the trial court will serve Ritchie's interest without destroying the Commonwealth's need to protect the confidentiality of those involved in child-abuse investigations.").

## VII

### Freedom of Information Act Request

When Hopkinson filed his petition for writ of habeas corpus in the district court, he filed a complaint under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA) "in conjunction with and as a part of [the] petition for writ of habeas corpus," I R. tab 9, at 2. Hopkinson alleged that the federal government defendants [24] had wrongfully denied him access to Federal Bureau of Investigation (FBI) records of investigations about him ("the Hopkinson file"). In response, the defendants moved to dismiss the complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), or, in the alternative, for summary judgment. I R. tab 34. In support of the motion for summary judgment, the defendants submitted an affidavit of an FBI agent stating that documents in the Hopkinson file came within certain FOIA exemptions. I R. tab 35, Exhibit A. The district court denied the 12(b)(1) motion and originally denied summary judgment as well, holding the affidavit "not sufficiently detailed to enable a de novo assessment of the government's claimed exemptions." II R. tab 43, at 3. The court required defendants to submit for *in camera* inspection an index summarizing each document in the file and specifying the exemption defendants claimed for the particular document. *Id.* at 4. After defendants submitted this index, the court reviewed it *in camera* and upheld the claim of exemption. III R. tab 54. Hopkinson appealed.

Defendants claim that the entire Hopkinson file is exempt from the FOIA under 5 U.S.C. § 552(b)(7)(D). Exemption 7(D) provides, in pertinent part, that the FOIA

"does not apply to matters that are ... records or information compiled for law enforcement purposes, but only to the

---

24. The following agencies and individuals were named as defendants:

"UNITED STATES DEPARTMENT OF JUSTICE, WILLIAM F. SMITH, (INDIVIDUALLY), WILLIAM F. SMITH, (ATTORNEY GENERAL OF THE UNITED STATES), FEDERAL BUREAU OF INVESTIGATION, WILLIAM H. WEBSTER, (INDIVIDUALLY), WILLIAM H. WEBSTER, (DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION), RICHARD L. HUFF, (INDIVIDUALLY), RICHARD L. HUFF, (CO–DIRECTOR OF THE OFFICE OF PRIVACY AND INFORMATION APPEALS OF THE UNITED STATES DEPARTMENT OF JUSTICE), and JAMES K. HALL, (INDIVIDU-

ALLY), JAMES K. HALL, (CHIEF OF FREEDOM OF INFORMATION PRIVACY ACTS SECTION RECORDS MANAGEMENT DIVISION)."

I R. tab 9, at 1. This petition was never given a separate case number in district court. The federal defendants responded in district court and received summary judgment in their favor. They did not file a separate brief in this court. We assume that the defense of the summary judgment in the state defendants' brief represents the views of the federal defendants on appeal.

extent that the production of such law enforcement records or information ... could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation ..., information furnished by a confidential source."

5 U.S.C. § 552(b)(7)(D).[25]

 To prevail on the exemption 7 claim, the government defendants must first show that the material sought to be protected is "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). They have met this threshold requirement in the instant case. Their *"Vaughn* index," *see Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed. 2d 873 (1974), which we have reviewed *in camera,* shows the Hopkinson file to consist of requests by a state law enforcement agency for FBI laboratory and fingerprint examinations of evidence the state agency collected, and the results of those examina-

tions.[26] All information in the Hopkinson file resulted from a state law enforcement investigation.[27]

 The defendants must also show they properly invoked exemption 7(D), the "confidential source" exemption. In *Johnson v. United States Department of Justice,* 739 F.2d 1514 (10th Cir.1984), we followed the approach of the Sixth and Seventh Circuits in placing the burden of proving confidentiality. We stated, " '[u]nless there is evidence to the contrary in the record, ... promises of confidentiality are inherently implicit in FBI interviews conducted pursuant to a criminal investigation.' " *Id.* at 1517 (quoting *Miller v. Bell,* 661 F.2d 623, 627 (7th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed. 2d 484 (1982)). *Accord, Keys v. United States Deptartment of Justice,* 830 F.2d 337, 344–46 (D.C.Cir.1987). We think that confidentiality was "inherently implicit" when the state law enforcement agency sent materials to the FBI laboratory for testing. Further, the 1986 amendments to 7(D) explicitly state that state and local agencies may be considered confidential sources under 7(D). *See* Note, *Developments Under the Freedom of Information*

**25.** A 1986 amendment applies to any requests for records, whether or not made prior to the effective date of the amendment, and to civil actions pending on that date. Anti–Drug Abuse Act of 1986, Pub.L. 99–570 § 1804(a), 100 Stat. 3207, 3207–50 (1986). Accordingly, the amendment applies to Hopkinson's FOIA request.

**26.** 28 C.F.R. § 0.85(g) authorizes the FBI Laboratory "to provide, without cost, technical and scientific assistance ... for all duly constituted law enforcement agencies ... which may desire to avail themselves of the service."

**27.** Exemption 7 is not limited only to information gathered for federal law enforcement purposes, but applies with equal force to FBI laboratory tests conducted at the request of local law enforcement authorities. *Wojtczak v. United States Department of Justice,* 548 F.Supp. 143, 146–48 (E.D.Pa.1982). This interpretation of exemption 7 encourages cooperation and information sharing between local law enforcement agencies and the FBI. *Id.* at 148. *See also Shaw v. Federal Bureau of Investigation,* 749 F.2d 58, 64–65 (D.C.Cir.1984) (exemption 7 "treats authorized federal investigations into violations of federal law and of state law on a par").

Although *Wojtczak* and *Shaw* were decided before the 1986 Amendment to the FOIA, their reasoning survives the amendment and we adopt it. The 1986 amendment broadened the scope of exemption 7's threshold requirement from "investigatory records compiled for law enforcement purposes" to "records or information compiled for law enforcement purposes."

Although several courts have stated that a federal law enforcement purpose must be shown in order for the government to meet the threshold requirement for exemption 7, *see, e.g., Pratt v. Webster,* 673 F.2d 408, 420 (D.C.Cir. 1982); *Irons v. Bell,* 596 F.2d 468, 471 (1st Cir. 1979); *Church of Scientology v. United States Department of the Army,* 611 F.2d 738, 748 (9th Cir.1979); *Powell v. United States Dept. of Justice,* 584 F.Supp. 1508, 1522 (N.D.Cal.1984); *Malizia v. United States Department of Justice,* 519 F.Supp. 338, 347 (S.D.N.Y.1981); *Lamont v. Department of Justice,* 475 F.Supp. 761, 773 (S.D.N.Y.1979), no case in which such a statement occurred addressed federal law enforcement investigations into state crimes. Accordingly, we believe our decision is not inconsistent with these cases.

*Act—1986*, 1987 Duke L.J. 521, 526 n. 46 (discussing legislative history to these amendments). Therefore, we affirm the district court's decision holding all of the documents in the Hopkinson file exempt from disclosure under 5 U.S.C. § 552(b)(7)(D).[28]

## VIII

### Caldwell Claim

■■■ ANDERSON, Circuit Judge, delivering the opinion of the Court as to part VIII and its judgment, in which CONWAY, District Judge, concurs.

Hopkinson contends that certain remarks by the prosecutor during his summation caused the jury to feel less responsible than it should for the sentencing decision, thus violating the requirement of reliability in the sentencing process articulated in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Darden v. Wainwright*, 477 U.S. 168, 183–84 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144, the Supreme Court explained its decision in *Caldwell* as follows:

> "*Caldwell* involved comments by a prosecutor during the sentencing phase of trial to the effect that the jury's decision as to life or death was not final, that it would automatically be reviewed by the State Supreme Court, and that the jury should not be made to feel that the entire burden of the defendant's life was on them. This Court held that such comments 'presen[t] an intolerable danger that the jury will in fact choose to minimize the importance of its role,' a view that would be fundamentally incompatible with the Eighth Amendment requirement that the jury make an individualized decision that death is the appropriate punishment in a specific case. *Id.* [472 U.S.] at 333 [106 S.Ct. at 2641–42].
>
> ". . . . *Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows

the jury to feel less responsible than it should for the sentencing decision."

The challenged comments here, taken out of context, are as follows:

> "The testimony of Mrs. Barbara Oakley, the clerk of this court, when I asked her if the guilt phase had gone to the United States Supreme Court and had come back from them prior to this testimony, she said, yes, the record revealed that. That is the facts in this case. But the Wyoming Supreme Court sent it back because of error in the first trial on the death penalty as it pertained to the Jeff Green matter. *The Wyoming Supreme Court will review whatever action you take in this case. It's an automatic review. So, the matter of error, the matter of mistake is not one for us to be concerned with here.* Judge Ranck has done his best, his duty to instruct you on the law. We have given you the facts from the witness stand as best we can. You have to do your duty as best you can, and I'm sure you will. But, because of some possibility of error, they say don't give him the death penalty. That's not what the law is. It's nowhere in your instructions from the Court."

IX–F R. at 1246–48 (emphasis added).

In our recent en banc decision in *Parks v. Brown*, 860 F.2d 1545 (10th Cir.1988) (en banc), we describe a two-step process for evaluating a *Caldwell* issue:

> "A two-step inquiry is appropriate when examining alleged *Caldwell* violations. *See Darden v. Wainwright*, 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986). First, the court should determine whether the challenged prosecutorial remarks are the type of statements covered by *Caldwell*. In other words, they must be statements that tend to shift the responsibility for the sentencing decision away from the jury. If so, the second inquiry is to evaluate the effect of such statements on the jury to determine whether the state-

---

**28.** Because we affirm the district court's decision on the 7(D) exemption, we do not address defendants' alternative claim that certain por-

tions of the file are exempt under 5 U.S.C. § 552(b)(7)(C) and (F).

ments rendered the sentencing decision unconstitutional."

*Id.* at 1549. We also stated in *Parks* that "[i]n evaluating the challenged statements, it is necessary to examine the context in which they were made. *See Darden v. Wainwright,* 477 U.S. 168, 179, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *Dutton v. Brown,* 812 F.2d 593, 596 (10th Cir.1987) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987)." *Id.* at 1550.

### A.

With respect to the first step prescribed by *Parks,* an examination of the challenged remarks in this case shows that they do not fall within the "Caldwell" category. Context is particularly important.

In *Franklin v. Lynaugh,* —— U.S. ——, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), the Supreme Court rejected an argument that the Eighth Amendment mandates consideration by capital juries, during the sentencing phase, of residual doubts over a defendant's guilt. *Id.* 108 S.Ct. at 2327. Concurring, Justice O'Connor, joined by Justice Blackmun, stated:

> " 'Residual doubt' is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.' Petitioner's 'residual doubt' claim is that the States must permit capital sentencing bodies to demand proof of guilt to 'an absolute certainty' before imposing the death sentence. Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing."

*Id.* at 2335 (O'Connor, J., concurring). Yet, Hopkinson's counsel pursued the equivalent of just such a strategy throughout this sentencing trial, including a request for an omnibus due process instruction requiring the jury to review the entire proceedings and make a determination whether due process was accorded to Hopkinson. Defendant's Proffered Instruction A, VI–H R. at 682. Witness after witness was examined

about fact mistakes in testimony about the crime and related circumstances, or examined in such a way as to cast doubt about the correctness of the finding of guilt. IX–A R. at 153, 158–60, 177–90; IX–B R. at 284–303, 308–15, 323, 356–83, 411–14, 437–49, 471–73, 474–75; IX–C R. at 558–87, 595, 677–84, 689–91; IX–D R. at 758–61, 841–60; IX–E R. at 942–46, 983. The arguments were hammered home at length in closing argument. *See, e.g.,* IX–F R. at 1215–18. The flavor of that tactic is captured by the following:

> "Bernie Foster said the victim was shot on the right side and it came out the left side. The doctor said he was shot in the left side and it came out the right side. It doesn't make any difference. It gives you an idea of how the case was investigated. That was a mistake the prosecution made in collecting evidence and in presenting it to the first jury because there was no cross-examination of Dr. Stahl in the first case, but it was illustrated in this case. A simple mistake, you say. Well, when you're gambling with a man's life, you can't play fast and loose with the evidence; and for me, that's a mistake."

*Id.* at 1216.

Hopkinson's strategy of emphasizing mistakes or uncertainties in the guilt or innocence phase of the trial in order to inject doubts into the jurors' minds, was buttressed by reminding the jury that the first proceeding had been reversed by the Wyoming Supreme Court because of mistakes. Barbara Oakley, Clerk of the District Court for Teton County, was the second witness called at the sentencing phase. She testified for the limited purpose of introducing an exemplified copy of Hopkinson's conviction for the murder of Jeff Green. On cross-examination Hopkinson's counsel elicited the following testimony:

> "Q. (By Mr. Munker) In deference to the Judge, he was reversed on the Green case, was he not?
>
> "A. Yes, he was.
>
> "Q. Okay. And the supreme court affirmed, if you know, the conviction of

the Vehars, but reversed and remanded the death penalty as to Jeff Green?

"A. Yes, they did.

"Q. Am I leading you too bad?

"A. No, you're not.

"Q. Okay. And so what you read really was the result and *finding of the last jury and that has now been set aside, has it not?*

"A. *That's correct.*

"MR. MORIARITY: I object to the form of the question. It's an improper statement of the facts.

"THE COURT: But as it goes and what he's talking about is all right.

"MR. MUNKER: Let me refrain from what I said and let me try again, Judge.

"Q. (By Mr. Munker) The supreme court reviewed it, the judgment of the Court in that case, did they not?

"A. Yes, they did.

"Q. And they reversed and remanded a portion that pertains to Jeff Green?

"A. Yes, they did."

IX–A R. at 159–60 (emphasis added).

In closing argument, Hopkinson's counsel continued pressing the point:

"This case is before you for one reason. Judge Ranck made a mistake in the last case, and it went to the supreme court, and they told him what the mistake was, and they sent it back. Now, you've seen how careful Judge Ranck is, and he is careful. He's fair; he's one of the best trial judges I've ever been in front of; but he made a mistake, and the supreme court sent it back for you to take up one issue and one issue alone. And that is whether you're going to determine the penalty as to Jeff Green and no one else. The jury before determined the penalty as to the Vehars, and Mr. Moriarity has spent a great deal of time talking about that and bootstrapping that into this case. I won't spend nearly the time that he has because that's already been determined. And the jury determined that there was no death penalty under the facts in that case."

. . . .

"Now, if you see how careful the Judge is, you have to be perfect. He

made one mistake. You're not even entitled to that."

IX–F R. at 1202–03, 1214.

Following those arguments, counsel for the state objected to arguments by Hopkinson's counsel relating to the presence of mistakes, and further argument that the jury could consider the possibility of Hopkinson's innocence as a mitigating circumstance. IX–F R. at 1228. The court replied: "THE COURT: I agree totally with what the prosecution has said in this case. However, I'm not going to say a word. The request is denied. Even though I agree with them." *Id.*

It was in the context of this full-scale attempt to persuade the jury not to act because of possible mistakes in the underlying trial, that the prosecutor made the challenged remarks:

"You know, they say Dr. Stahl made a mistake; Bernie Foster made a mistake. The jurisdiction of this case has been proven in the previous case. It's been ruled on by the Wyoming Supreme Court. There's no question where the murder occurred, but if you wanted to take their argument logically, and if Jeff Green was murdered someplace else, and he was dumped right there at the mouth of the Bridger Valley, it is exactly for the reasons that we say it is. So a statement is made to intimidate those witnesses. So that they find his body and know why he was killed. And really know who killed him.

"Another matter, they talked about the possibility of error. There is no such thing as perfection. This system works to the best it can, but there are safeguards built in. That's due process. The Wyoming Supreme Court, as Mr. Munker said, reviewed the first trial. They found no error in the guilt phase. That went to the United States Supreme Court, and it was denied cert.

"MR. SKAGGS: Objection, your Honor. There is flatly no evidence of that and if I can't bring in something there is no evidence of, he can't either.

"MR. MORIARITY: Well—

"THE COURT: Now, let me try and handle it. The jury has heard a lot of statements in closing arguments with reference to matters which technically there is no evidence on. And I won't talk about who said what, that's strictly up to you. But I have given everybody wide latitude and I'm not going to stop now. The jury will just sift it out.

"MR. MORIARITY: Thank you, your Honor.

"The testimony of Mrs. Barbara Oakley, the clerk of this court, when I asked her if the guilt phase had gone to the United States Supreme Court and had come back from them prior to this testimony, she said, yes, the record revealed that. That is the facts in this case. But the Wyoming Supreme Court sent it back because of error in the first trial on the death penalty as it pertained to the Jeff Green matter. The Wyoming Supreme Court will review whatever action you take in this case. It's an automatic review. So, the matter of error, the matter of mistake is not one for us to be concerned with here. Judge Ranck has done his best, his duty to instruct you on the law. We have given you the facts from the witness stand as best we can. You have to do your duty as best you can, and I'm sure you will. But, because of some possibility of error, they say don't give him the death penalty. That's not what the law is. It's nowhere in your instructions from the Court."

IX–F R. at 1246–48. Thus, taken in context, the challenged remarks by the prosecutor were both proper and non-misleading, and do not approximate the nature of the remarks (reinforced by an instruction from the court) in *Caldwell.*

In *Caldwell,* as here, the prosecutor referred to the existence of appellate review, but unlike the circumstances here, the prosecutor's reference to appellate review in *Caldwell* was in the context of telling the jury, twice, that "your decision is not the final decision." *Caldwell v. Mississippi,* 472 U.S. at 325, 105 S.Ct. at 2637. The full remarks in *Caldwell* were:

"'ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, *they would have you believe that you're going to kill this man and they know— they know that your decision is not the final decision.* My God, how unfair can you be? Your job is reviewable. They know it. Yet they …

"'COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.

"'ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.

"'THE COURT: Alright, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.

"'ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said "Thou shalt not kill." If that applies to him, it applies to you, *insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court.* Automatically, and I think it's unfair and I don't mind telling them so.' *Id.,* at 21– 22."

*Id.* at 325–26, 105 S.Ct. at 2638 (emphasis added).

The direct statements about finality in *Caldwell* are the ones emphasized by the Supreme Court. Thus, the Court stated:

"The argument here urged the jurors to view themselves as taking only a *preliminary step* toward the actual determination of the appropriateness of death—*a*

*determination which would eventually be made by others and for which the jury was not responsible."*

*Id.* at 336, 105 S.Ct. at 2643 (emphasis added). In her concurring opinion in *Caldwell,* Justice O'Connor likewise stressed the reference to finality:

"In telling the jurors, *'your decision is not the final decision* ... [y]our job is reviewable,' the prosecutor sought to minimize the sentencing jury's role, by creating the mistaken impression that automatic appellate review of the jury's sentence *would provide the authoritative determination of whether death was appropriate."*

*Id.* at 342–43, 105 S.Ct. at 2646 (emphasis added). And, in the explanation of *Caldwell* in *Darden v. Wainwright,* quoted above, the Court again emphasized the prosecutor's express admonition to the jury that its decision was not the final decision. *Darden v. Wainwright,* 477 U.S. at 183 n. 15, 106 S.Ct. at 2473 n. 15.

The remarks in this case carried no such message. They were addressed to the subject of mistakes in the underlying proceedings, not to possible mistakes by the jury in the actual sentence. The sentencing jury's role obviously is not to reevaluate guilt or innocence, or to indulge residual doubts as surrogates for the original jury which decided that issue, or, contrary to contentions by the defense, to guarantee perfection in the proceedings themselves. Thus, the challenged statements here are qualitatively different from those in *Caldwell* and could not have diluted "the jury's sense of its actual role in the sentencing process." *Parks v. Brown,* 860 F.2d at 1549.

In *Parks* we examined other statements by the prosecutor, statements by defense counsel, and instructions from the court to support our conclusion "that the jury's sense of its actual responsibility and authority for making the sentencing decision was not diminished." *Id.* at 1550. A similar examination here is equally supportive of the same conclusion. The jury was instructed in no uncertain terms by the trial court that the full and final responsibility

for Hopkinson's sentence lay with them. Instruction No. 8 provides:

"You should not act hastily or without due regard for the gravity of these proceedings. Before you ballot, you should carefully weigh, sift and consider the evidence and all of it and bring to bear your best judgment upon the sole issue which is submitted to you at this time: Whether the defendant shall be sentenced to death or to life imprisonment.

*"Your decision as to the sentence to be imposed is mandatory. You are not merely recommending a sentence to the Judge. You are the final decision-makers as to whether Mark Hopkinson will be sentenced to life in prison or to death."*

VI–H R. at 699 (emphasis added). That instruction was simply a restatement of a jury responsibility theme which dominated the sentencing proceedings beginning with the court's instruction at the commencement of the sentencing trial. *Id.* at 687. The theme was picked up by the prosecutor in his opening statement ("Please understand that the instructions on the law will come from Judge Ranck and I am not instructing you on the law." IX–A R. at 35); and, echoed by Hopkinson's counsel in his opening statement ("Fourteen men and women who have the guts in this county to judge a man's life, and I come before you to ask you to give life as the prosecutor comes before you and asks you to kill. And in this opening argument I am going to explain to you the reasons why I feel you should give life and not kill. And during the case you will see those reasons why you should give life and not kill." IX–A R. at 63). Closing arguments of all counsel returned over and over to the fact that the entire responsibility for Hopkinson's sentence lay with the jury. *See, e.g.,* IX–F R. at 1164, 1169, 1200, 1202, 1207, 1213, 1226, 1237–38, 1242, 1252.

In the middle of closing arguments the court reinforced its written instructions to the jury by telling them the following:

"THE COURT: Ladies and gentlemen of the jury, you are the exclusive judges of the facts and the effect and value of the evidence. The jury has been in-

structed on the law. You have it in your hands. That is the law of this case. What counsel says, as I have said many times, it applies equally to both sides, is not evidence. It will be up to you to decide. You have the law; you have the evidence. I'm going to give counsel wide latitude in their closing arguments. Please proceed."

IX–F R. at 1213.

There is, of course, the argument that the challenged remarks by the prosecutor were not followed by any corrective instruction by the court, and were made during the final argument so as to preclude response by Hopkinson's counsel. However, it must be remembered that the court's written instruction telling the jury that it bore the sole, full and final responsibility for Hopkinson's sentence was placed in the hands of each juror and taken by the jurors into the jury room. Those written instructions were before the jury throughout the entire period of their deliberations, a circumstance which would completely overcome a passing comment by the prosecutor during the course of lengthy closing arguments by multiple counsel.

We discussed in *Parks* the fact that not every comment which tends to place the jury's decision in a larger context must be viewed as a *Caldwell* violation. In *Parks* we held it was not such a violation when the prosecutor told the jury, among other things:

"But, you know, as you as jurors, you really, in assessing the death penalty, *you're not yourself putting Robyn Parks to death. You just have become a part of the criminal-justice system that says when anyone does this, that he must suffer death.* So all you are doing is you're just following the law, and what the law says, and on your verdict—once your verdict comes back in, the law takes over. *The law does all of these things, so it's not on your conscience.* You're just part of the criminal-justice system that says that when this type of thing happens, that whoever does such a horrible, atrocious thing *must* suffer death.

"Now that's man's law. But God's law is the very same. God's law says that the murderer shall suffer death. *So don't let it bother your conscience, you know.*"

*Parks v. Brown,* 860 F.2d at 1549 (emphasis added). We then reviewed other cases in the area, stating:

"Other decisions of this court and other courts of appeals are instructive on the scope of *Caldwell* and its applicability to the statements made by the prosecutor in this case. In *Dutton v. Brown,* 812 F.2d 593 (10th Cir.1987) (en banc), *cert. denied,* ___ U.S. ___, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987), this court rejected a *Caldwell* challenge to statements similar to the ones challenged here. In *Dutton,* the prosecutor told the jurors that they were 'part of the process' and were 'not functioning as individuals.' *Id.* at 596. This court held that 'when taken in context, the statement of the prosecutor was not constitutionally impermissible.' *Id.* at 596–97. Rather, the statement 'merely underscored that the jury was part of the whole system of justice.' *Id.* at 597.

"In *Coleman v. Brown,* 802 F.2d 1227 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987), the prosecutor told the jury that it was 'not writing the verdict' because the defendant, not the jury, was responsible for the defendant's plight. We concluded in *Coleman* that the defendant's rights were not violated:

[T]he dangers the Court identified in *Caldwell* are not present in the remarks made here. This method of argument does not permit the jury to rely on someone else to make the ultimate sentencing decision or otherwise dilute or trivialize the jury's responsibility. Unlike the argument in *Caldwell,* the argument used here did not suggest to the jury that someone else now has *control* over the defendant's fate.

*Id.* at 1240–41 (emphasis in original).

"Several other circuits have rejected *Caldwell* challenges to prosecutorial statements that were more egregious

than the ones in this case and while we have no occasion to approve or disapprove of those holdings, they do show how other circuits have read *Caldwell.* *See, e.g., Sawyer v. Butler,* 848 F.2d 582, 595 (5th Cir.1988) (jury was told that 'there will be others who will be behind you to either agree with you or to say you are wrong'), *reh'g granted,* (available on Westlaw), 1988 U.S.App. Lexis 12690; *Stewart v. Dugger,* 847 F.2d 1486, 1489–93 (11th Cir.1988) (judge told jury that 'this is one of those cases where the legislature has said that the death penalty is the appropriate penalty' and prosecutor informed the jury of its advisory role); *Harich v. Dugger,* 844 F.2d 1464, 1472–75 (11th Cir.1988) (en banc) (advisory jury was told that its sentence was only a recommendation and that the court would make the final decision). Our research reveals that the circuit court decisions that have invalidated sentencing decisions under *Caldwell* involved prosecutorial remarks that clearly shifted the ultimate sentencing authority away from the jury. *See, e.g., Mann v. Dugger,* 844 F.2d 1446 (10th Cir.1988) (jury was told that its decision was only an 'advisory' recommendation and that the sentencing decision was not on its shoulders); *Wheat v. Thigpen,* 793 F.2d 621, 628–29 (5th Cir.1986) (jury was told that a death penalty decision would not be final and if the jury made a mistake a reviewing court would send the case back), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987)."

*Parks v. Brown,* 860 F.2d at 1551–52 (footnote omitted).

For the many reasons just outlined, we conclude, therefore, as we did in *Parks,* that *Caldwell* is not implicated in this case as a threshold matter. Viewing the prosecutor's statements in context, we hold that the remarks did not reduce the jury's sense of its actual responsibility and authority for determining the appropriate penalty.

### B.

Alternatively, under the second step of the analysis prescribed in *Parks,* we hold

that even if the challenged remarks are the type of statements covered by *Caldwell* they did not render the sentencing decision unconstitutional. That is, the effect of the statements on the jury was not "sufficient to deny petitioner his eighth amendment rights." *Parks v. Brown,* 860 F.2d at 1550 n. 5.

The crucial difference between our approach to this question and that employed by the dissent in this case lies in the standard of review which is deemed to be controlling. The dissent urges adoption of the following standard: "violations can be overlooked only if a reviewing court can conclude with confidence that they had '*no effect* on the sentencing decision,'" citing language from *Caldwell v. Mississippi,* 472 U.S. at 341, 105 S.Ct. at 2646.

As the dissenting opinion recognizes, the "no effect on the jury" or "no possibility" standard approaches (and in our view reaches) a *per se* reversal rule. Nothing in *Caldwell* surrounding or leading up to the language in question suggests the creation of such a standard.

The dissenting opinion acknowledges that its derivation of a "no effect on the jury's decision" standard from *Caldwell* is inconsistent with conclusions reached by the only two circuits which have had occasion directly to address the issue: *Sawyer v. Butler,* 848 F.2d 582, 597–98 (5th Cir. 1988), *reh'g granted,* 848 F.2d 582 (5th Cir.1988) (whether remarks so infected the proceeding with unfairness as to deny due process); and *Tucker v. Kemp,* 802 F.2d 1293, 1295 (11th Cir.1986) (en banc), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987) (reasonable probability standard).

Additionally, an essentially *per se* reversal rule is inconsistent with this court's opinion in *Parks.* In *Parks* we expressly declined to address the standard of review issue. *Parks v. Brown,* 860 F.2d at 1550 n. 5. However, as noted above, we erected a two-step inquiry for examining *Caldwell* violations. The first step determines whether the challenged remarks are those covered by *Caldwell.* The second step seeks to determine whether the offending

statements rendered the decision unconstitutional. We did not reach the second step in *Parks*. But, under a virtual *per se* reversal standard the two-step inquiry outlined in *Parks* would be meaningless as a practical matter. Only a one-step inquiry would be needed, i.e., whether the challenged statements are those covered by *Caldwell*. An affirmative answer would result in automatic reversal, because it would always be impossible for an appellate court to say that the offending remarks had "no effect" whatsoever on the sentencing decision.

Over the past decade and a half the Supreme Court has considered a variety of Eighth Amendment issues in capital sentencing cases without resorting to the "no effect" standard invoked by the dissent.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Justices Stewart, Powell, and Stevens interpreted *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), as establishing a "substantial risk" standard for testing the constitutionality of death sentencing procedures. *Id.* 428 U.S. at 188, 203, 96 S.Ct. at 2932, 2939.

In *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court expressly rejected a no-possible-effect standard in a case where the jury was instructed on both invalid and valid aggravating circumstances, stating: "more importantly, for the reasons stated above, *any possible* impact *cannot* fairly be regarded as a constitutional defect in the sentencing process." *Id.* at 889, 103 S.Ct. at 2749 (emphasis added) (footnote omitted).

In *Wainwright v. Goode*, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983), the Court considered the *degree* to which the process of balancing aggravating and mitigating factors was infected by a particular statutory provision. *Id.* at 86, 104 S.Ct. at 383.

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), arose in a Sixth Amendment context, which arguably distinguishes the case from the one before us involving the Eighth Amendment, but it is the only recent case in which the Court directly focused on the standard of review applicable at least to a certain type of an issue (effective assistance of counsel) in a capital sentencing proceeding. In *Strickland* the Court specifically rejected a *per se* standard ("some conceivable effect," *id.* at 693, 104 S.Ct. at 2067), and adopted a standard of "reasonable probability" that but for the error the outcome would have been different. *Id.* at 694–96, 104 S.Ct. at 2068–69. Reasonable probability was defined as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. The approach is a "prejudice" analysis.

In *Caldwell v. Mississippi*, 472 U.S. at 343, 105 S.Ct. at 2647, Justice O'Connor, concurring, referred to "unacceptable risk." In his dissenting opinion, Justice Rehnquist, joined by Justices Berger and White, stated that: "*[T]he ultimate inquiry must be whether the statements rendered the proceedings as a whole fundamentally unfair.*" *Id.* at 350, 105 S.Ct. at 2650 (Rehnquist, J., dissenting) (emphasis added).

In *Skipper v. So. Carolina*, 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986), the Court ultimately avoided articulating a standard by concluding that the exclusion of mitigating evidence of the defendant's "good adjustment" in prison was sufficiently *prejudicial* "under *any* standard" to constitute reversible error (emphasis added).

In *Turner v. Murray*, 476 U.S. 28, 33, 106 S.Ct. 1683, 1686, 90 L.Ed.2d 27 (1986), the Court viewed the framework for evaluation as "whether under all of the circumstances presented there is a *constitutionally significant likelihood*" that jurors would not be indifferent to race (emphasis added). And, *quoting from Justice O'Connor's concurring opinion in Caldwell*, the standard was further described by the Court as whether the circumstances "created an *unacceptable risk*." *Id.* at 36, 106 S.Ct. at 1688 (emphasis added).

In *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1783, 95 L.Ed.2d 262 (1987), dissenting Justices Brennan, Marshall, Blackman, and Stevens invoked both a

"substantial risk" and a "significant probability" standard, *in part relying on Justice O'Connor's concurring opinion in Caldwell:*

> "*Furman* held that the death penalty 'may not be imposed under sentencing procedures that create a *substantial risk* that the punishment will be inflicted in an arbitrary and capricious manner.' *Godfrey v. Georgia,* 446 U.S., [420] at 427, 100 S.Ct., [1759] at 1764 [64 L.Ed.2d 398 (1980)]. As Justice O'CONNOR observed in *Caldwell v. Mississippi,* 472 U.S. 320, 343, 105 S.Ct. 2633, 2647, 86 L.Ed.2d 231 (1985), a death sentence must be struck down when the circumstances under which it has been imposed 'creat[e] an *unacceptable risk* that "the death penalty [may have been] meted out arbitrarily or capriciously" or through "whim or mistake"' (emphasis added) (quoting *California v. Ramos,* 463 U.S. 992, 999, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983)). This emphasis on risk acknowledges the difficulty of divining the jury's motivation in an individual case. In addition, it reflects the fact that concern for arbitrariness focuses on the rationality of the system as a whole, and that a system that features a *significant probability* that sentencing decisions are influenced by impermissible considerations cannot be regarded as rational."

*Id.* 107 S.Ct. at 1783 (Brennan, J., dissenting) (emphasis added) (footnote omitted).

Just a few months ago, in their concurring opinion in *Franklin v. Lynaugh,* 108 S.Ct. at 2334 (O'Connor, J., concurring), Justices O'Connor and Blackmun, quoting from *Skipper v. So. Carolina,* 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986), stated:

> "In *Skipper* we vacated a death sentence because 'it appear[ed] *reasonably likely* that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence.'"

(emphasis added). The dissenting justices in *Franklin,* (Justices Stevens, Brennan, and Marshall) used "substantial risk" as the standard:

> "Under our cases, the *substantial risk* that the jury failed to perceive the full ambit of consideration to which evidence of petitioner's past good conduct was entitled requires us to vacate the death sentence and remand for resentencing."

*Franklin v. Lynaugh,* 108 S.Ct. at 2338 (Stevens, J., dissenting) (emphasis added).

Finally, just prior to *Franklin,* in *Mills v. Maryland,* —— U.S. ——, 108 S.Ct. 1860, 1867, 100 L.Ed.2d 384 (1988), the Court, in evaluating the impact of instructions and a verdict form on the jury's consideration of mitigating evidence, stated: "[u]nless we can rule out the *substantial possibility* that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing." (emphasis added). And, in that portion of *Mills* quoted in the dissenting opinion here, the court referred only to a *degree* of possibility instead of "no possibility," i.e.: "[t]he possibility that petitioner's jury conducted its task improperly certainly is *great enough* to require resentencing." *Id.* 108 S.Ct. at 1870.

Admittedly, distinctions exist between *Caldwell* and the other types of Eighth Amendment issues just surveyed. Additionally, the cases surveyed are a long way from establishing a firm standard to be applied in all cases. However, taken together, the quoted standards all fall within a general range which is significantly short of a *per se* standard of reversal. There is little justification for an argument that every Eighth Amendment capital sentencing issue must be analyzed under a different standard, and that, therefore, *Caldwell* issues deserve a special, strict standard all their own. An array of such significantly varying standards from issue to issue would only further confound the highly sensitive area of capital punishment cases.

In our en banc decision in *Parks* this court adopted the *Mills* "substantial possibility" standard in a "*California v. Brown*"[29] issue relating to the impact on a jury of an instruction cautioning against

---

**29.** *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

sympathy. No higher standard should be required here.

Of course, distinctions can be drawn between *"Caldwell"* and *"Brown"* issues. In the former, instructions or arguments which successfully diminish the jury's sense of its responsibility infect the entire deliberation process. In the latter, only the jury's consideration of mitigating evidence is involved. But the latter more typically involves instructions from the court, and *the influence of instructions on the jury (as opposed to remarks from counsel) arguably presents a more serious situation.* More to the point, however, the focus in each instance is upon the reliability of the product of the jury's deliberation.

For the same reason that it is essentially indefensible to apply a higher standard to a *"Caldwell"* issue than to a *"Brown"* issue, we are constrained not to argue for a *lower* standard than the "substantial possibility" standard adopted by our court in *Parks* for evaluating a *"Brown"* issue. Accordingly, in our view the proper standard for evaluating the *Caldwell* issue in this case, if a violation exists, is whether there is a substantial possibility that the prosecutor's statements, taken in context, affected the sentencing decision.

■ Applying the "substantial possibility" standard of review we have no difficulty holding that the remarks in question, assuming they fell within the category of remarks covered by *Caldwell*, did not unconstitutionally affect the sentencing decision. This determination involves, perhaps even more importantly, the same considerations employed in the first step of this two part analysis. The nature and extent of the contested remarks, whether they were repeated or isolated, the context in which they were made, the court's instructions with respect to the jury's responsibility and authority, other statements by the prosecutor, statements by defense counsel, and similar factors all assist in assessing the likely effect of the challenged remarks on the jury. Additional considerations dealing with such matters as the weight and nature of the evidence relating to the aggravating

and mitigating circumstances are confined to this part of the two step analysis.

In Part A, above, we reviewed in detail the context in which the challenged remarks were made, as well as the court's firm instructions to the jury, and clear statements by both defense and prosecution counsel which stressed to the jury its awesome responsibility. We reiterate and incorporate all of that discussion here.

The context of the remarks, statements by both counsel, and explicit instructions by the court, all outlined in Part A, made it crystal clear to this jury that they bore the full weight of decision as to capital punishment. In addition to that, the other parts *of the opinion in this case describe in detail the overwhelming evidence against Hopkinson* as to the aggravating circumstances, and the comparatively slight evidence as to any mitigating circumstances.

This sentencing proceeding spanned a ten-day period, filled one thousand two hundred seventy pages of transcript and involved many witnesses. Hopkinson's counsel were afforded the broadest possible latitude and their tactics were wide-ranging and sometimes far afield from the rightful purpose of evidence permissible in a sentencing proceeding. *See Franklin v. Lynaugh,* 108 S.Ct. at 2320. The trial judge, already once reversed by the Wyoming Supreme Court in the prior proceedings, accorded Hopkinson and his counsel every indulgence. That he consciously made an effort to do so is revealed by the court's statement to counsel toward the end of the proceedings acknowledging that the court had "been rather hard on the prosecution at conversations at the bench and in chambers. In fact, I have tried to see to it that any difficulties that I have encountered, and there have been many in this case, have reflected wherever possible to the benefit of the defendant." IX–E R. at 1006.

It is not logical to believe that this jury sat through these extensive proceedings, pleas, arguments, evidence, and the solemnity of the court's instructions, and entered upon its deliberations in the jury room thinking it did not bear the full responsibili-

ty of a capital punishment decision. To the contrary, this was specifically a sentencing proceeding. Its purpose was obvious to the jury from the outset, and the jury's responsibility was brought home to it at every step and in every aspect of the proceedings.

While we do not condone the challenged remarks of the prosecutor in this case, it is utterly implausible that this jury's sense of its responsibility was in any way diminished, or its sentencing decision affected by those exceedingly brief remarks. There is no constitutional infirmity in these proceedings, and the outcome should be affirmed.

### IX

### *Conclusion*

For the reasons stated in this opinion, the order of the district court is AFFIRMED in all respects except that portion dealing with Hopkinson's access to post-trial grand jury transcripts, discussed in Section VI of this opinion. The case is REMANDED to the district court which is directed to itself examine *in camera* the grand jury testimony considered in Section VI of this opinion, and to make such further orders with respect to its findings on that matter as justice requires. Hopkinson's death warrant is stayed until and subject to further order of the district court.

IT IS SO ORDERED.

LOGAN, Circuit Judge, dissenting:

The most difficult issue in this appeal is whether we must vacate the death sentence imposed in the second sentencing proceeding because the prosecutor's argument was impermissible under the Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). There are really two questions to decide, as Judge Anderson's opinion for the majority recognizes: Was there an impermissible prosecutorial argument? And, if so, under the proper standard of review, is reversal required? I would hold the prosecutor's argument violated the rule announced in *Caldwell*, and that under the

standard of review explicitly expressed in that case, we are required to adjudge the death penalty invalid and enjoin the execution of Hopkinson. This would be without prejudice to further proceedings by the State of Wyoming to redetermine the sentence on the Green murder conviction.

### A. Improper Prosecutorial Argument

In *Caldwell*, the Supreme Court vacated a death sentence imposed after the prosecuting attorney argued to the jury that it did not bear ultimate responsibility for imposing the death sentence because its verdict would be reviewed on appeal. The improper argument in *Caldwell* proceeded as follows:

"ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know— they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they ...

COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.

ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.

THE COURT: Alright, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.

ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said 'Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him

up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so."

*Caldwell,* 472 U.S. at 325–26, 105 S.Ct. at 2637–38.

Throughout the *Caldwell* opinion the Court demonstrated its concern that these uncorrected statements rendered the death sentencing process unconstitutional. The Court noted several specific dangers that such arguments pose: First, the jurors might not realize that most appellate courts review such sentencing determinations with the presumption that the jury verdict is correct; thus, jurors might underestimate the importance of their role in the imposition of death sentences. *Id.* at 330–31, 105 S.Ct. at 2640. Second, a jury, believing that an appellate court would correct any excesses, "might ... wish to 'send a message' of extreme disapproval for the defendant's acts," *id.* at 331, 105 S.Ct. at 2641, by returning a verdict of death. Third, prosecutorial arguments of this nature bias juries toward imposing death sentences out of a desire to delegate to the appellate court the responsibility of deciding whether the death penalty is appropriate: "[C]orrectly assum[ing] that a sentence of life in prison could not be increased to a death sentence on appeal," jurors who are reluctant both to impose and to rule out the death sentence might believe that they effectively could abstain by imposing the death penalty and leaving it to the appellate court to make the final choice. *Id.* at 332, 105 S.Ct. at 2641. Finally, such an argument might induce jurors, confronted with the "very unfamiliar situation" of serving on a capital sentencing jury, to minimize the importance of their role and in effect to defer to the appellate court's judgment of whether the death sentence should stand. *Id.* at 332–33, 105 S.Ct. at 2641.

Because the prosecutor's argument created these dangers of systematic bias toward imposing the death penalty, the Court condemned the argument and reversed the death sentence in *Caldwell.* However, as post-*Caldwell* decisions in this circuit demonstrate, *Caldwell* does not require a death sentence to be reversed in every case in which a prosecutor attempts to overcome jurors' misgivings about the death penalty or refers to the reviewability of a jury's sentencing determination. In *Coleman v. Brown,* 802 F.2d 1227 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987), this court reviewed a prosecutorial argument containing remarks "somewhat analogous" to those in *Caldwell.* There, the prosecutor argued to the jury:

> "[T]hey try to put the responsibility on you, like it's all your fault.... [L]et me make it real clear that you're not writing the verdict in this case. Don't—don't be mistaken into believing that it's your responsibility that this happened, that you're, you're writing the verdict. I, I say to you, this man wrote the verdict on February 9th, and all those days after when he got out of jail and went on [sic] spree of knifing and kidnapping and killing. He wrote the verdict. This man. He wrote it in blood over and over."

*Id.* at 1240. Although the prosecutor did say to the jury, "[Y]ou're not writing the verdict in this case," we found that "the dangers the Court identified in *Caldwell* are not present in the remarks made here." *Id.* We noted that the prosecutor's argument did not "permit the jury to rely on someone else to make the ultimate sentencing decision or otherwise dilute or trivialize the jury's responsibility.... Instead, it only brought into focus that defendant is responsible for his own plight." *Id.* at 1240–41. We also examined the context of the prosecutor's argument and found it "evident that the prosecutor had no intention of diminishing the jury's sense of responsibility." *Id.* at 1241.

In *Dutton v. Brown,* 812 F.2d 593 (10th Cir.) (en banc), *cert. denied,* —— U.S. ——, ——, 108 S.Ct. 116, 197, 98 L.Ed.2d 74, 149 (1987), the defendant objected to the following statements by the prosecutor:

> "[Defense counsel] argues that the final decision is yours, and of course, to some

degree it is. But you are, as I am, as Judge Theus is, as all the courts are, part of the process. We are not functioning as individuals....

. . . . .

And we are all part of the law and it is the law that makes us work. So it has to be in that attitude, in that frame of mind, that you approach the problem."

*Id.* at 596. As in *Coleman*, we analyzed the prosecutor's statement in context and found that it did not violate *Caldwell*. We held: "The statement was not designed to, nor did it, suggest to the jury that it was not ultimately responsible for deciding Mr. Dutton's punishment. The prosecutor merely underscored that the jury was part of the whole system of justice, and within that system it had a grave responsibility." *Id.* at 597. *Coleman* and *Dutton* demonstrate that, when we face a claim that a prosecutor's argument violates *Caldwell*, we must view the prosecutor's statements in context and in light of the *Caldwell* Court's specific concerns about prosecutorial arguments of this type.

In the case before us, the prosecutor made these statements in the rebuttal part of his closing argument immediately before the case was submitted to the jury:

"Another matter, they [defense counsel] talked about the possibility of error. There is no such thing as perfection. This system works to the best it can, but there are safeguards built in. That's due process. The Wyoming Supreme Court, as Mr. Munker said, reviewed the first trial. They found no error in the guilt phase. That went to the United States Supreme Court, and it was denied cert.

MR. SKAGGS: Objection, your Honor. There is flatly no evidence of that and if I can't bring in something there is no evidence of, he can't either.

MR. MORIARITY: Well—

THE COURT: Now, let me try and handle it. The jury has heard a lot of statements in closing arguments with reference to matters which technically there is no evidence on. And I won't talk about who said what, that's strictly up to you. But I have given everybody wide latitude and I'm not going to stop now. The jury will just sift it out.

MR. MORIARITY: Thank you, your Honor.

The testimony of Mrs. Barbara Oakley, the clerk of this court, when I asked her if the guilt phase had gone to the United States Supreme Court and had come back from them prior to this testimony, she said, yes, the record revealed that. That is the facts in this case. But the Wyoming Supreme Court sent it back because of error in the first trial on the death penalty as it pertained to the Jeff Green matter. *The Wyoming Supreme Court will review whatever action you take in this case. It's an automatic review. So, the matter of error, the matter of mistake is not one for us to be concerned with here.* Judge Ranck has done his best, his duty to instruct you on the law. We have given you the facts from the witness stand as best we can. You have to do your duty as best you can, and I'm sure you will. But, because of some possibility of error, they say don't give him the death penalty. That's not what the law is. It's nowhere in your instructions from the Court."

IX–F R. 1246–48 (emphasis added). This argument was presented in response to defense counsel's assertions that the jury should not impose the death penalty because the prosecution's witnesses had been mistaken about some of the evidence, *see id.* at 1215–18; because of the possibility that an innocent person might be executed, *id.* at 1239 ("I think probably the most compelling argument, though, against the death penalty, is the possibility of mistake; and I'm sure that most of you have read that throughout ... recorded history there have been executions and it has came [sic] to light afterwards that individuals had not committed the crimes they had been charged with."); and because of the possibility of a legal or procedural mistake during the sentencing hearing, *see id.* at 1203, 1214.

This is a particularly difficult case because one possible understanding of the remarks is that they refer only to trial

errors being corrected upon appeal. But in my view the remarks also may be understood to convey that the appellate court will second-guess the evidence and can grant relief from the death sentence. *See Wheat v. Thigpen*, 793 F.2d 621, 627–29 (5th Cir.1986), *cert. denied*, 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987). On balance, I believe that the prosecutor's remarks, by representing to the jury that it should not concern itself with the possibility of error because any error would be corrected on appeal, impermissibly diminished the jurors' sense of personal responsibility for the verdict and thereby "rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Caldwell*, 472 U.S. at 323, 105 S.Ct. at 2636 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion)). The facts of this case resist any principled differentiation from those of *Caldwell*. As in *Caldwell*, the prosecutor told the jury that its verdict would be reviewed automatically by the state supreme court; here, the prosecutor even went beyond the offensive remarks in *Caldwell* by specifically telling the jury that "the matter of mistake is not one for [you] to be concerned with here." *See Wheat*, 793 F.2d at 629 n. 8. As in *Caldwell*, despite defense counsel's objections, the trial judge did not correct the prosecutor's statements, but allowed them to stand.

The state argues that the jury was "adequately instructed concerning the significance of their role and the sentencing procedure." Brief of Respondents–Appellees at 56. Yet I do not believe that the jury

instructions cured the *Caldwell* violation. Although the jury was instructed, "You are not merely recommending a sentence to the Judge. You are the final decision-makers as to whether Mark Hopkinson will be sentenced to life in prison or to death," VI–H R. 699 (Instruction 8), this instruction did not address the misleading nature of the prosecutor's argument: the prosecutor argued to the jury that *any* mistake would be rectified on appeal, and the trial court did not correct this statement. The court failed to inform the jury that mistakes in weighing the evidence could be corrected *only if* no reasonable jury could have found the aggravating circumstance to exist and the mitigating circumstances to be absent.[1] Consequently, as in *Caldwell*, "[a]lthough ... subsequent remarks ... may have helped to restore the jurors' sense of the importance of their role, ... they failed to correct the impression that the appellate court would be free to reverse the death sentence if it disagreed with the jury's conclusion that death was appropriate." 472 U.S. at 343, 105 S.Ct. at 2647 (O'Connor, J., concurring in part and concurring in the judgment).

I would conclude, therefore, that the dangers that *Caldwell* found inherent in such arguments are also present in the instant case. The jury was told not to concern itself with the "possibility of error" because its decision would be reviewed. It was not instructed that the Wyoming Supreme Court would employ a presumption of correctness in conducting this automatic review, and consequently might have assumed that the reviewing court would consider de novo the propriety of capital punishment in this case. I cannot be confident that this jury, after hearing this uncorrect-

---

1. In addressing this issue the Wyoming Supreme Court relied upon Justice O'Connor's concurring opinion in *Caldwell*, which was necessary to achieve a majority. *See Hopkinson VI*, 708 P.2d at 48. As the Wyoming Supreme Court noted, Justice O'Connor would permit accurate information regarding appellate review to be submitted to the jury. *Caldwell*, 472 U.S. at 342, 105 S.Ct. at 2646. But she made clear that to be acceptable such information would have to include an explanation of the limited nature of such review. *Id.* at 342–43, 105 S.Ct. at 2646–47.

I do not dispute the Wyoming Supreme Court's interpretation of Justice O'Connor's concurrence. Her opinion is consistent with the plurality opinion's position that any reference to appellate review which does not inform the jury of the presumption of correctness applied by appellate courts is misleading and thus improper. The Wyoming Supreme Court, however, overlooked the failure of the court or prosecutor to inform the jury properly about the limited nature of appellate review.

ed prosecutorial argument, fully appreciated its responsibility to determine that death was the appropriate punishment.

## B. Standard of Review

Because I would find a *Caldwell* violation, I must also address the standard of review to be applied. The Eleventh Circuit, in an en banc split decision, adopted a fundamental fairness standard for *Caldwell* violations. *Tucker v. Kemp*, 802 F.2d 1293, 1295–96 (11th Cir.1986) (en banc), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987). To make that determination, the court stated that the inquiry, derived from the "prejudice prong" of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is whether there is " 'a reasonable probability that, in the absence of the offending remarks, the sentencing outcome would have been different' .... A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.' " *Tucker*, 802 F.2d at 1295–96 (quoting *Tucker v. Kemp*, 762 F.2d 1480, 1483–84 (11th Cir. 1985)). A divided Fifth Circuit panel recently stated the proper standard of review to be whether the *Caldwell* remarks were "error that so infected the trial as to deny due process." *Sawyer v. Butler*, 848 F.2d 582, 599 (5th Cir.1988) (footnote omitted). I note that the Fifth Circuit has voted to reconsider that decision en banc. *See id.* at 606.

With respect, I believe the standards of review applied by these cases are wrong, and that the dissenting opinions in *Tucker* and *Sawyer* correctly analyze the requirements for reversal for *Caldwell* error. In *Caldwell*, the Court did not require the petitioner to prove actual prejudice; indeed,

the limitations of the appellate process and the rules against polling jurors would effectively preclude any such proof. Rather, *Caldwell* evaluated, in the context of the prosecutor's argument and the court's instructions to the jury, the inherent tendency of the improper remarks "to minimize the jury's sense of responsibility for determining the appropriateness of death." 472 U.S. at 341, 105 S.Ct. at 2646. *Caldwell*'s concern with the jury's decision-making process approaches a per se rule of reversal: violations can be overlooked only if a reviewing court can conclude with confidence that they had "*no effect* on the sentencing decision," *id.* (emphasis added), a standard far less forgiving than the Fifth and Eleventh Circuits' standards.

*Tucker* and *Sawyer* both cited a post-*Caldwell* Supreme Court decision, *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), as support for their standards. But *Darden* did not alter the "no effect" standard applied in *Caldwell;* if anything, it reinforced that standard: "In this case, none of the [prosecutor's] comments *could have had the effect* of misleading the jury into thinking that it had a reduced role in the sentencing process." *Darden*, 477 U.S. at 184 n. 15, 106 S.Ct. at 2473 n. 15 (emphasis added).[2] *Tucker* and *Sawyer* both treated the "no effect" statement in *Caldwell* as dictum, throwaway language. But the dissenting opinion in *Sawyer* clearly illustrates that the Court recognized that the majority in *Caldwell* indeed was establishing a rule applicable in the *sentencing* proceeding different from that applied to the *guilt* phase of trial. *Sawyer*, 848 F.2d at 603 n. 4 and 5 (King, J. dissenting).[3]

**2.** *See also* the Court's comment:
"This Court held that such comments 'presen[t] an intolerable danger that the jury will in fact choose to minimize the importance of its role,' a view that would be fundamentally incompatible with the Eighth Amendment requirement that the jury make an individualized decision that death is the appropriate punishment in a specific case...."
*Darden*, 477 U.S. at 183 n. 15, 106 S.Ct. at 2473 n. 15.

**3.** *Darden* itself distinguished *Caldwell*, stating:

"The principles of *Caldwell* are not applicable to this case. *Caldwell* involved comments by a prosecutor during the sentencing phase of trial to the effect that the jury's decision as to life or death was not final, that it would automatically be reviewed by the State Supreme Court, and that the jury should not be made to feel that the entire burden of the defendant's life was on them....
"... In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing.... *Caldwell* is relevant

Further support for a strict standard of review comes from the recent Supreme Court decision in *Mills v. Maryland,* —— U.S. ——, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). *Mills* involved an ambiguous jury instruction used during the capital sentencing phase of trial, where one reading of the instruction would have rendered a death sentence improper. The Court reversed, finding the mere possibility of such an error sufficient:

> "The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case. The possibility that petitioner's jury conducted its task improperly certainly is great enough to require resentencing."

*Id.* at ——, 108 S.Ct. at 1870. The Court's focus on possibility rather than probability of error reinforces my reading of *Caldwell* and *Darden* and my rejection of the *Tucker* and *Sawyer* standards of review.

In fairness to the court and counsel, the sentencing proceeding was three years before *Caldwell* was decided, and overall the court and counsel on both sides did a remarkable job. But as reluctant as I am to force a third sentencing trial, I cannot say that the prosecutor's remarks "had no effect on [the jury's] sentencing decision," *Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646.[4] Therefore, I would hold that Hopkinson's death sentence was imposed in violation of the Eighth Amendment and must be vacated.

---

only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel *less responsible* than it should for the sentencing decision. In this case, none of the comments could have had the effect of misleading the jury into thinking that it had a reduced role in the sentencing process." 477 U.S. at 183 n. 15, 106 S.Ct. at 2473 n. 15.

**4.** Judge Anderson, for the panel majority, indicates that no Supreme Court decision other than *Caldwell* has stated a "no effect" standard of review. Although *Skipper v. South Carolina,* 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986), does contain the "under any standard" language quoted, I believe it adopts a "no effect"

standard of review for errors in the admission of mitigating evidence in a death sentencing proceeding by stating, in the crucial paragraph *of the opinion:* "Nor can we *confidently* conclude that credible evidence that petitioner was a good prisoner would have had *no effect* on the jury's deliberations." *Id.* at 8, 106 S.Ct. at 1673 (emphasis added).

